# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

GLEN TAYLOR HELZER,
Defendant and Appellant.

S132256

Contra Costa County Superior Court
012057-6

January 22, 2024

Chief Justice Guerrero authored the opinion of the Court, in which Justices Corrigan, Liu, Kruger, Groban, Jenkins, and Evans concurred.

# PEOPLE v. HELZER

## S132256

Opinion of the Court by Guerrero, C. J.

Defendant Glen Taylor Helzer pleaded guilty to five counts of murder (Pen. Code, § 187)[1] and admitted associated special circumstances as follows: the murders of Ivan and Annette Stineman, with robbery and kidnapping special circumstances (§ 190.2, subd. (a)(17)(i), (ii)); the murder of Selina Bishop, with the special circumstance of murder to prevent testimony (§ 190.2, subd. (a)(10)); and the murders of Jennifer Villarin and James Gamble, with a multiple-murder special circumstance for Gamble's murder (§ 190.2, subd. (a)(3)). Defendant also pleaded guilty to conspiracy (§ 182, subd. (a)(1)); two counts of kidnapping (§ 209); extortion (§§ 518, 520); three counts of robbery (§§ 211, 212.5, subd. (a)); three counts of burglary (§§ 459, 460); attempted robbery (§§ 211, 212.5, subd. (a), 664); false imprisonment (§§ 236, 237); and possession of a controlled substance for sale (Health & Saf. Code, § 11378). He also admitted a weapons enhancement (§ 12022, subd. (b)(1)) connected with the burglary, robbery, and false imprisonment counts. Following a penalty trial, a jury returned a verdict of death for the five counts of murder and the court imposed a judgment of death. Defendant also received sentences of life imprisonment without the possibility of parole for the kidnapping counts, 25 years to life for the conspiracy count, and

---

[1] All undesignated statutory references are to the Penal Code.

1

additional determinate sentences for the remaining counts. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

## I. FACTUAL BACKGROUND

Defendant, his brother Justin Helzer,[2] and their friend Dawn Godman were charged as codefendants in the kidnapping and murders of Ivan and Annette Stineman and the murders of Selina Bishop, Bishop's mother, Jennifer Villarin, and Villarin's friend James Gamble. Godman subsequently pleaded guilty to 18 counts in exchange for her agreement to testify against defendant and Justin. After the trial court denied the brothers' motions for separate trials, defendant pleaded guilty to all charges and received a penalty phase trial.[3]

### A. Prosecution Evidence

#### 1. *Defendant's Background*

The prosecution presented evidence at the penalty phase regarding defendant's life before he committed the charged crimes. This evidence covered defendant's experience with the Mormon faith and his excommunication; his work as a financial advisor, which was how he met the Stinemans; his drug abuse; and moneymaking schemes, with the crimes in this case resulting from one of those schemes.

---

[2] We refer to defendant's brother by his first name to avoid confusion.

[3] Justin pleaded not guilty by reason of insanity. After defendant entered his guilty pleas, the trial court severed the proceedings and Justin was tried before defendant's penalty phase trial occurred. A jury found Justin guilty of all charges and legally sane, and sentenced him to death.

### a. *The Mormon Church*

Defendant was raised in the Mormon church and practiced this religion into adulthood.  A former Mormon bishop testified regarding his understanding of the Mormon faith.  Among other tenets, he described the belief that individuals can receive revelations from God, communicate with spirits, and become a god.  A woman who attended church with Godman also provided testimony regarding Mormon beliefs, including the view that certain men were prophets of God.

Defendant began to disagree with the direction of the church's principles and spoke of getting messages from "Spirit."  He told others that killing is sanctioned if it is God's will, and cited passages from the Bible and Book of Mormon for support.  He believed there was no right or wrong, and that all people had the potential to become gods.  Defendant believed he was close to becoming a god.  He also believed he was a prophet and he held meetings in the church parking lot with Justin.

Sometime in 1999 or 2000, defendant spoke at a church event about taking a hiatus from the Mormon church.  His appearance was "striking" — he had long, dark hair and facial hair, wore peculiar glasses, and wore a long black trench coat.  He was eventually excommunicated from the church.

### b. *Financial work*

In 1992, defendant began working as a financial advisor trainee at a Morgan Stanley branch in Concord.  A stockbroker at the firm described defendant as "a good, clean Mormon kid" who was "happy-go-lucky" when he joined the team.  Defendant had many clients, including the Stinemans who were retired and financially well off.  Defendant developed a friendly relationship with the Stinemans and frequently visited their

home to help with their finances.  The Stinemans spoke fondly of defendant.

In 1996, after defendant got married and shortly after the birth of his first daughter, he began to change.  Defendant started smoking, staying out late at night clubs, and going into work late.  Clients began complaining to defendant's manager that he was not returning their phone calls.  Defendant told his manager that he did not believe his actions would impact his life or his career, and when he was through having fun, he would come back to work and function as a financial advisor and a father.

Defendant left the firm in 1998.  He told several people that he was faking a psychiatric illness and had himself declared legally insane to collect disability payments and avoid legal punishment.  Defendant had to visit doctors to confirm the existence of a disability.  In preparation for the visits, he would deliberately not shower or shave and would practice how to act in front of the doctors.  Defendant was formally terminated from the firm in 1999.

c. *Drug use and moneymaking schemes*

Between 1996 and the time he was arrested, defendant used marijuana, Ecstasy, and methamphetamine.  He also made methamphetamine in his garage and sold Ecstasy at raves.

Defendant met Godman at a church event in late 1997.  They had extensive conversations about defendant's philosophy of living one's life in alignment with God; Godman accepted these principles as true.  She believed that defendant and Jesus Christ were brothers, and that defendant was a prophet of God.  In February 2000, Godman joined defendant in selling drugs.

In 1998, defendant met Keri Mendoza. She thought defendant was "full of life and love." They began a romantic relationship and she eventually moved in with defendant and Justin. Defendant introduced her to Ecstasy about one month after she moved in. During the course of their relationship, Mendoza provided the primary source of income for herself and defendant. She also loaned defendant money. Despite this, defendant was in significant debt. He wanted to be "set for life" and had several illicit moneymaking ideas to try to make that happen.

In late 1998 or early 1999, defendant proposed several escort schemes. Many involved throwing parties where men could pay to get into the party and then have their choice of the women in the room. Another scheme involved tricking young stockbrokers into having sex with underage girls and then blackmailing the stockbrokers' company for money. None of these schemes came to fruition.

At some point in 1998, defendant came up with the idea of "Transform America." The idea was to create an organization of people who were committed to bring Harmony, a self-help program he had previously attended, to the world. The plan required an "inner core" of three people — defendant plus two others who had to earn his trust and be loyal to him. Lina Richardson, who met defendant at a Harmony training, testified that one example of the kind of trust and loyalty defendant wanted was if he killed someone and brought the body home, a person would cut up and hide the body without asking a single question. The inner core was originally defendant, Justin, and Mendoza. After defendant and Mendoza ended their relationship around December 1999, Godman became the third

person.  In March or April 2000, defendant, Justin, and Godman moved into a house located on Saddlewood Court in Concord.

Around the time they moved to this house, defendant came up with a plan called "Children of Thunder."  The plan was to extort money from one of defendant's past clients to fund Transform America and bring about the second coming of Jesus Christ peacefully.  Defendant believed that the second coming would be preceded by darkness and apostasy, and to avoid the darkness, he would sacrifice a few to save billions.  According to Godman, defendant planned to "take one of [his] past clients . . . and extort them for their money that was in their [brokerage] account, to kill them and to have another individual take — deposit the money in another individual's account, and then have that individual withdraw the money and give it to [defendant]."  The individual withdrawing the money would also be killed.  The Saddlewood house in Concord was going to be the base of operations for the first step of this scheme.

### 2. *Circumstances of the Crimes*

Defendant identified former clients of his who maintained a brokerage portfolio of at least $100,000.  Justin purchased a Beretta nine-millimeter semiautomatic firearm and defendant removed the serial number from his own .22-caliber semiautomatic pistol.

Defendant, Justin, and Godman thought of ideas for how to dispose of the bodies.  One involved getting dogs from a shelter and having the dogs eat the bodies.  They adopted three dogs for this purpose.  They gave the dogs large amounts of animal meat and bones to see how much they could eat; defendant determined they could not eat enough to consume three people.  Defendant, Justin, and Godman decided instead

6

to dismember the bodies, put the pieces in duffel bags, and use a Jet Ski to dump the bags out on the Sacramento-San Joaquin Delta (Delta). They purchased tools and supplies to implement the plan, including a reciprocating saw, a skill saw, water gloves, ski masks, a briefcase, duffel bags, handcuffs, and leg irons.

Around May 2000, defendant began dating Selina Bishop. Defendant's intention was to have Bishop deposit money from the Children of Thunder scheme and then kill her. Defendant told her that he was going to be inheriting $125,000. He asked Bishop if she would be willing to open new bank accounts and deposit $25,000 in each account, then transfer the money to defendant in $20,000 increments. In exchange for helping him, Bishop could keep the remaining $5,000 from each increment.

Defendant, Justin, and Godman thought about, considered, refined, and prayed about this scheme for at least three months before selecting July 30, 2000 as the date to act on their plan. In early July, they scouted the residences of each person on defendant's list of former clients, and defendant put them in order of who to attack first. A corporate airline pilot was at the top of the list. The pilot had the most money in his brokerage accounts, was single, and lived in a location with easy access that was somewhat isolated from his neighbors. The Stinemans were second on defendant's list.

Godman testified that on the early morning of July 30, she gathered with defendant and Justin to declare war on Satan by openly stating their intent to follow through with what they believed was God's will. Defendant attempted to establish an alibi by asking a friend to buy four movie tickets for later that day and then go to a restaurant and buy enough food for four

people. Defendant was concerned that the friend followed through with the alibi and called to make sure everything went as planned.

Around noon, Godman bought a bottle of wine. Defendant's plan was to go to the pilot's house with Justin, and say he was with a new company and had just made a lot of money. Defendant would say that the wine was for a new customer down the road, but they did not want the bottle. Defendant would ask the pilot to join him in a drink to celebrate. If he had guests, defendant thought they could kidnap and kill up to five people to avoid leaving any witnesses. If more than five people were present, defendant and Justin would "find a way out" of the house.

That night, defendant and Justin drove to the pilot's house in defendant's car while Godman followed in Justin's truck. They knocked on the door, but no one answered. They moved on to the next people on the list, the Stinemans. Defendant and Justin parked away from the Stinemans' house while Godman parked Justin's truck down the street to keep an eye on the house and look out for police. Defendant and Justin walked up to the Stinemans' house wearing business suits. Defendant carried a briefcase containing handcuffs, a gun, a blowtorch to use for threatening, a Taser gun, and a cell phone. Ivan answered the door and both men entered the home.

Approximately one hour later, defendant drove to Godman in the Stinemans' white van. Godman saw the silhouettes of four people in the van. Defendant said, "I got it," and drove away. Godman likewise drove back to the Concord house.

Back at the house, defendant questioned Ivan while Godman questioned Annette, in separate rooms, about their

plans for the next few days. When they all reconvened, defendant explained to the Stinemans that he had money trouble and they would need to stay with him until he got the money out of their accounts. While the Stinemans slept, defendant, Justin, and Godman took methamphetamine to stay awake and went over plans on how to take money out of the Stinemans' accounts.

The following morning, on July 31, Godman called Morgan Stanley pretending to be Annette, and directed the branch manager to liquidate the Stinemans' account. Defendant then had Ivan cancel appointments for the next few days and call family members to say they were taking a short vacation. Defendant forced the couple to make out checks totaling $100,000 to Selina Bishop.

Defendant gave the Stinemans a drug that was supposed to kill them, but the drug did not work as planned. Defendant and Justin carried Ivan and Annette into the bathroom. Defendant put a plastic bag over Annette's face and Justin put a bag over Ivan's face to suffocate them. When that did not work, defendant started banging Annette's head on the bathroom floor. Justin started doing the same to Ivan. Defendant placed Annette partially inside the bathtub, slit her throat with a knife, and turned her over so the blood flow would suffocate her. The Stinemans eventually died; Annette from the suffocation and Ivan from the beating. Godman watched while the Stinemans were murdered.

Godman changed her clothes and wrote a $10,000 check that she signed with Annette's name. She drove to the Stinemans' bank and deposited the check into Ivan's account "[t]o distract the police." Godman used a wheelchair in an

attempt to disguise herself. When she returned to the Saddlewood house, she observed several black plastic bags containing the Stinemans' body parts.

The following day, on August 1, Godman tried to deposit the Stinemans' checks into Bishop's bank account. The branch manager tried to contact the Stinemans to confirm the transaction and left a message on their machine. Later that day, defendant and Godman drove to the Stinemans' house to retrieve the answering machine tape and other identifying information; they had already taken the Stinemans' social security cards the night of the kidnapping. Godman called Bishop's bank, pretending to be Annette, and left a message for the branch manager with the Stinemans' social security numbers. She explained that they were visiting their sick granddaughter, Bishop, and they needed the money deposited quickly.

The following afternoon, on August 2, Bishop visited the Saddlewood house. While defendant distracted Bishop in the living room, Justin came up beside them and hit Bishop over the head with a hammer several times. Defendant and Justin took Bishop into the bathroom where defendant then cut her throat with a hunting knife. After watching Bishop die, Godman went into the living room to clean the carpet. Godman could hear a saw running in the bathroom. Defendant and Godman burned Bishop's possessions in the fireplace, as they had already done with the Stinemans' clothing and belongings. While the fire was burning, defendant wanted to see if one of their dogs would eat human flesh. He fed the dog two small pieces of Bishop's skin.

Defendant realized that Bishop's mother, Jennifer Villarin, could identify him. Early the next morning, on

August 3, defendant and Godman drove to Bishop's apartment in Woodacre, California, where Villarin was staying. Defendant found Villarin and Gamble asleep. He shot Villarin twice in the face. Gamble managed to exit the bed before defendant shot him through the chest.

Back at the Saddlewood house, defendant decided they needed to remove the Stinemans' and Bishop's teeth to prevent their identification. Later that day, defendant, Godman, and Justin drove to the Delta with the remains of the three victims and a rented Jet Ski in tow. Defendant and Justin loaded the bags of remains on the Jet Ski, took them into the water to discard the bags, and then returned for more. They repeated this process several times, with Godman joining Justin for the last trip. They returned to the Saddlewood house once finished.

Defendant, who had plans to leave on a trip, left Justin and Godman a list of things to do, including cleaning the house and returning the Jet Ski. Justin and Godman also disposed of several incriminating items. Justin and Godman tried to clean the carpet themselves but eventually decided to hire professional cleaners. The cleaners cleaned the carpet on August 6, leaving behind industrial-sized fans to dry the carpet. Defendant returned from his trip that afternoon.

3. *The Investigation*

On August 3, the Stinemans' daughter went to their house. She had been unable to contact them for four days and was concerned. After noticing several things that looked awry in the house, she feared her parents were missing and called the police. Concord police officers responded and began to investigate the couple's disappearance.

Meanwhile, Marin County Sheriff's deputies responded to a call at Bishop's apartment. They found Villarin's and Gamble's bodies, both with gunshot wounds. Emergency medical personnel arrived and declared both victims dead. Marin County Sheriff's Detective Steve Nash obtained and served a search warrant that morning for the Woodacre residence where Villarin's and Gamble's bodies were found.

An autopsy revealed the cause of Villarin's death was two gunshot wounds to the head. Gamble's cause of death was a gunshot wound to the upper chest. He suffered five gunshot wounds.

In an effort to find Bishop during the investigation, Detective Nash learned that she was dating a man who lived with his brother in Concord. Detective Nash recovered Bishop's pager from the café where she worked and traced a phone number on it to Justin. Phone records for Justin led Detective Nash to the Saddlewood Court address in Concord; Detective Nash soon learned that defendant also lived at that address. He also learned that Justin had recently purchased a gun consistent with the weapon used to kill Villarin and Gamble. Detective Nash obtained a search warrant for the Saddlewood premises.

Around 4:00 a.m. on August 7, 2000, Marin County officers and Concord SWAT team members assembled in anticipation of serving the warrant approximately two hours later. After officers entered the residence, defendant tried to flee out a back window but officers stopped him. While a detective subsequently interviewed defendant in the back of a patrol car, he threw himself out of the partially open window and ran off. He ran into a neighbor's house and threatened to kill the

resident if he did not give defendant his keys. When defendant saw the resident's dogs running toward him, he fled from the house and ran into another neighboring home, this time threatening the resident with a knife to obtain a change of clothes and keys to her car. The resident's son called the police, who arrived and detained defendant when he ran out of the house.

The search of the Saddlewood premises, which ultimately involved the execution of multiple search warrants, revealed a substantial amount of evidence implicating defendant, Justin, and Godman in the crimes. Meanwhile, nine gym bags containing the victims' remains were recovered from the Delta, each weighed down with stepping stones from the Saddlewood premises or rocks from the Delta. Inside the gym bags, the large body parts and removed organs were individually wrapped in black plastic bags.

The pathologist who performed the autopsies testified about the condition of the Stinemans' and Bishop's remains. In addition to being dismembered, the bodies showed signs of stabbing and blunt force trauma that occurred before death and significant mutilation after death, including removal of internal organs, jaws, and teeth.

4. *Victim Impact Evidence*

The Stinemans' two adult daughters testified about their family life, the trusting relationship their parents had with defendant, and their grief. A friend of the Stinemans, a friend of Villarin, several members of Villarin's and Bishop's family, and Gamble's mother also testified about their memories of the victims and the pain of their loss.

## B. Defense Evidence

### 1. *Background Evidence*

The defense presented evidence of mental illness in defendant's family, his involvement in the Mormon church growing up, and his kind and energetic nature.

Several witnesses testified about defendant's mission for the church in Brazil, and his return. A fellow missionary described that defendant was excited, passionate, and hardworking when they first arrived in Brazil. Defendant related well to people and was readily accepted. Defendant had "some interesting ideas" about the end of the world, and they discussed the end of the world and the second coming of Christ. He believed that during the apocalypse, church leaders would become warrior prophets who would lead their people and "defend their faith as a warrior of sorts." Defendant believed he would become one of the warrior prophets.

Defendant grew increasingly frustrated with the mission president and other church leaders. If church leaders wrote something that defendant disagreed with, he claimed that he knew more than them and did not have to be accountable to them. Toward the end of his mission, defendant held beliefs that were "totally incompatible with the scriptures and Mormon doctrine." When defendant returned from Brazil, his views on scripture began to change and he started to believe that the church "was going in the wrong direction." He appeared exhausted and depressed.

Approximately one month after returning from his mission, in December 1991, defendant ran into a former classmate, Ann, and persuaded her to join the church. They began dating after she was baptized into the church and got

married in April 1993. Ann's uncle worked for Morgan Stanley and set up interviews for defendant; he began working there one week before the wedding. Ann testified that before they got married, defendant had been very sheltered within the church and did not have a realistic view of the world.

After defendant married and moved out of his parents' house, he discovered cable television and junk food. Their first daughter was born in the summer of 1995. Defendant and Ann separated around one year later. Defendant felt his life had been sheltered and he wanted to discover life outside of the church, including drinking alcohol, smoking cigarettes, and having a nonmonogamous lifestyle. Their second daughter was born in 1998. Ann noticed "significant" changes in defendant's behavior and appearance after the birth of their second daughter. When they had met, he was "really neat, really clean, pretty meticulous about his appearance, clean cut." In 1998, he started wearing dark and wrinkled clothing, grew his hair out, and looked as if he stopped showering. He stopped working for Morgan Stanley the same year, though Ann did not find out he left his job until 1999. Defendant was excommunicated from the church around the same time he left his job in 1998.

Defendant's sister left for her mission in 1995 and returned in early 1997. Upon her return, she noticed "severe changes" in defendant. He had "thrown away his religion" and had been experimenting with smoking and drugs. In 1999, during a visit home, defendant seemed angry and his appearance was "scraggly." Defendant started fights with his sister because he thought she was rejecting his philosophical and religious ideas.

2. *Expert Evidence*

Clinical psychologist Richard Foster met defendant in 1995 for counseling. Defendant and his wife had a "discrepancy" in their sexual desires which created tensions in their marriage, and Dr. Foster sought to help defendant work through their issues. Defendant believed that he was "entitled" to have "a wife whose sexual behavior is like what he witnesses in pornographic films." He also felt like he "was pretty much able to make happen whatever he wanted to happen," and grew frustrated he could not make his wife do what he wanted. During Dr. Foster's second meeting with defendant, he presented the doctor with a "highly detailed plan" that was "infused with a lot of narcissism" to find an ideal woman who would have sex with him daily. During their final meeting, defendant was "convinced that the only way to avoid his misery was to leave his wife." Dr. Foster did not diagnose defendant based on their few meetings but later opined that defendant's behavior was consistent with narcissism.

Psychologist Jeffrey Kaye testified that he met defendant in early September 1998. Dr. Kaye ran an Intensive Outpatient Program (IOP) at a health care facility, which involved multiple group therapy sessions on a weekly basis to try to reduce the number of hospitalized patients. The patients in the program were typically diagnosed with bipolar disorder, major depression, schizophrenia, or posttraumatic stress disorder. Defendant came to the program because he was upset and not able to function in his job. During their first meeting, Dr. Kaye believed defendant was in a manic phase. Defendant complained that he could not concentrate, was irritable and inappropriately angry, and believed people were judging him. Dr. Kaye diagnosed defendant with bipolar disorder, and a

psychiatrist on the program's staff prescribed medications. After defendant stopped attending meetings, Dr. Kaye reached out via telephone and described defendant as paranoid, isolating, and refusing to take his medications. Defendant often spoke about conversing with spirits.

Defendant returned to treatment two weeks after Dr. Kaye's phone call. At a meeting in late November, Dr. Kaye believed defendant's mood swings had worsened and recommended he voluntarily hospitalize himself, but defendant declined. At a meeting in December, defendant appeared to be experiencing a panic attack. In January, defendant showed up at the clinic dressed "very bizarrely," looking like "some kind of strange cartoon character." In February 1999, defendant was involuntarily hospitalized for psychiatric treatment. When Dr. Kaye saw defendant again in March, he had improved. At various times, they had discussed how defendant could get disability payments.

Psychologist Douglas Tucker specialized in addiction. He spoke with defendant once for three hours before testifying on his behalf. Prior to meeting with defendant, Dr. Tucker reviewed defendant's IOP records and his psychiatric hospitalization records. He diagnosed defendant with schizoaffective disorder, bipolar type. This meant defendant exhibited schizophrenic features, such as hallucinations and delusions, at times when he was not manic or depressed. Dr. Tucker further diagnosed defendant with smoked methamphetamine dependence. The doctor testified that defendant believed he was hearing God's voice, and that taking medication interfered with his ability to communicate with God. Defendant further believed he was "not actually a human being; that he is a manifestation of God's consciousness that is an

illusion, and has the illusion of being an individual, but is actually a fragment of a larger whole, which has this illusion of individuality in order that it might distinguish good from evil and find . . . its way towards God." When discussing defendant's drug abuse, Dr. Tucker explained that "a grandiose delusion or religious delusion that you're God gets heightened quite a bit when you use a stimulant drug like methamphetamine, so it's actually rewarding for the person to feel that their communication with God is that much better." Dr. Tucker opined that it is difficult to fake mental illness, especially mania. He believed defendant had a genuine mental illness because his symptoms were consistent.

Psychiatrist John Chamberlain interviewed defendant seven times and concluded that defendant suffered from schizoaffective disorder, bipolar type; methamphetamine dependence; cannabis dependence; and alcohol abuse. He testified that defendant "manifested significant grandiosity." At times defendant was "wrestling with the concept" of whether he was becoming a divine being and spoke of himself, God, and Jesus as if "they were sort of brethren on the same path in development or that he was somehow of God." When Dr. Chamberlain would ask defendant a question or to slow down when discussing his religious beliefs, defendant would get irritable at the distraction from his own thoughts. Dr. Chamberlain did not believe that defendant was malingering a mental illness.

## II. CHALLENGE TO GUILTY PLEA

Detective Nash obtained and executed two Marin County Superior Court search warrants for the Saddlewood premises in Concord. Detective Nash also assisted the Concord Police

Department in obtaining and executing a third search warrant for the Saddlewood premises, issued by the Contra Costa County Superior Court. Before trial, defendant and his codefendants filed a motion to suppress evidence seized pursuant to these warrants.

Defendant now raises a blanket suppression argument on appeal. He asserts that the officers who executed the Marin County warrants acted in flagrant disregard of the constraints imposed by the warrants by conducting what defendant characterizes as a general search of the Saddlewood premises. He contends that as a result of this claimed violation of his Fourth Amendment rights, all evidence seized pursuant to the execution of the Marin County warrants, as well as evidence subsequently obtained as purported "fruits" of these seizures, must be suppressed, and he must be entitled to withdraw his guilty plea and be tried on any remaining evidence. We reject defendant's claims and conclude blanket suppression of the evidence is not warranted.

## A. Trial Court Proceedings

On November 19, 2002, Godman filed an "Omnibus Notice of Motion and Motion to Suppress Evidence and Traverse Various Search Warrants."

Godman challenged the three searches of the Saddlewood premises on a variety of grounds. As relevant here, Godman argued that both Marin County Superior Court warrants were issued without probable cause, were overbroad, and were based on material misrepresentations and information unlawfully obtained during prior unlawful searches. She argued that the second Marin County Superior Court warrant further exceeded

the scope of the court's jurisdiction, and the items seized under the authority of the warrant were outside its scope.

The court began hearings on the motion on January 31, 2003. Regarding the initial search of the Saddlewood premises, the trial court found no error in the magistrate's determination that probable cause existed in issuing the search warrant. The court explained, "I believe, based upon what was before the magistrate in Marin, that there was a fair probability that evidence regarding the Woodacre murders could be found at Saddlewood Court in Concord." The court found that there were no material misrepresentations made, and the affidavit did not contain statements that were deliberately false or made with a reckless disregard for the truth.

Regarding the second search warrant issued for the Saddlewood premises by the Marin County Superior Court, as relevant here, Godman argued the search exceeded the scope of the warrant and that once officers were inside the premises, they seized items with "virtually no limits on the extent and scope" of the search. Godman further argued that officers collected evidence related to the Stinemans that fell outside the scope of the Marin County warrant. Godman also asserted that the Marin County magistrate did not have authority to issue a warrant to seize evidence relating to the Stinemans. The prosecution responded that by the time evidence related to the Stinemans was seized on August 7, it had become "patently obvious" that the Marin County investigation (for Villarin and Gamble) and the Contra Costa County investigation (for the Stinemans) "were inseparable and were inextricably interrelated."

The trial court concluded the Marin County magistrate had jurisdiction to issue the second warrant for Saddlewood, noting that the Woodacre murders of Villarin and Gamble were unsolved at the time it was issued, Bishop was still missing, and there was enough information to conclude that evidence of the murders and disappearance would be found in the Saddlewood premises. The court concluded that even if the magistrate exceeded her jurisdiction, the good faith exception articulated in *United States v. Leon* (1984) 468 U.S. 897 salvaged the search and seizure. The court further concluded that probable cause existed, the warrant was not a general warrant, and the search did not exceed the scope of the warrant.

Regarding the warrant issued by the Contra Costa Superior Court, the trial court rejected the defense's argument that it was the fruit of the previous searches. Yet the court acknowledged that without knowing additional details, some of the items in the return — "Halloween-type costumes, kitchen items and home decorations" — could have been beyond the scope of the warrant. The court delayed ruling on whether this search exceeded the scope of the warrant and withdrew its previous ruling on whether the search exceeded the scope of the second Marin County Superior Court warrant.

The court held another hearing on February 21, 2003. The prosecution argued that the defendants had the burden to prove which seized items, if any, fell outside the scope of the search warrants. The prosecution also advised that the evidence room at the police station was open for counsel to go through the evidence that had been collected. Noting that trial was scheduled to begin in September, the court set a new hearing in June to give the parties time to sort through the evidence.

At some point after the February hearing, Godman's counsel filed a supplemental pleading with a list of the challenged items; defendant joined the pleading. The list included items seized pursuant to both Marin County search warrants.

The parties returned on June 13, 2003. At that hearing, the defense argued that all the seized evidence had to be suppressed because of the officers' "flagrant disregard" for the terms of the warrants during the execution of the searches. The court reminded the defense that it had instructed counsel, if they wanted, to be more specific with which items they thought were outside the scope of the warrants. Defense counsel acknowledged the court's request, and explained that it was basing its argument on a different point — namely, that "it doesn't matter if the few items that we parse today are found to be outside the scope of the warrant[.] . . . [T]he search was so flagrant in exceeding the terms of the warrants . . . that all evidence must be suppressed. And that goes to volume more than it does to now parsing particular items." The prosecution responded that the officers had probable cause to seize every item retrieved from the Saddlewood premises.

After discussing the challenges involved in having the court review the entire universe of seized documents, the court proposed that it instead address the challenged items first. Godman contended that going through the items labeled indicia would be the defense's "biggest problem" because some items grouped together and described as a "single item" actually contained multiple documents — some that "probably" qualified as indicia of the crimes and others that were outside the scope of the warrant. The prosecution argued that the seizures could be upheld by reference to the warrant, the plain view doctrine,

and the inevitable discovery rule. The parties then discussed some of the specific items challenged in Godman's motion. The prosecutor argued that the search warrants permitted the officers to "go virtually anywhere into any box inside the house" and they had the authorization to seize "not only indicia" but also trace evidence. The court also noted that once information about the dismembered bodies came to light, and there was evidence that the bodies had been sawed, the officers had probable cause to seize items relating to the saw and the condition of the bodies.

After discussing some individual items, the court asked the prosecution to respond to each item challenged in Godman's pleading with a justification for the seizure. The prosecution agreed and offered to have both primary investigating officers testify.

## B. Testimony Regarding the Warrants

Another hearing took place two weeks later on June 27, 2003. At that hearing, witnesses testified regarding the procurement and execution of search warrants for the Saddlewood premises.

Detective Nash testified first. He explained that he became involved with the Villarin and Gamble murders on August 3, 2000, and secured a warrant for the Saddlewood premises on the morning of August 7. As additional information appeared, Detective Nash obtained a second search warrant later that day and then provided an oral affidavit in support of a third warrant requested by the Concord Police Department that same evening.

The first search warrant that Detective Nash obtained authorized a search of the Saddlewood premises and two

identified vehicles, and specifically listed eight categories of items to be searched for: (1) a nine-millimeter semiautomatic handgun; (2) nine-millimeter fully copper-jacketed ammunition; (3) expended nine-millimeter cartridges; (4) receipts and documents related to nine-millimeter handguns and ammunition; (5) a light-colored woman's T-shirt or other short-sleeved shirt with small flowers; (6) dark or possibly black pants or jeans; (7) "[i]ndicia of ownership, including but not limited to leasing documents, Department of Motor Vehicles documents indicating ownership of the vehicle, letters, credit card gas receipts, keys and warranties"; and (8) "[i]ndicia of occupancy or ownership; articles of personal property tending to establish the identity of persons in control of the said premises, storage areas or containers where the above items are found consisting of rent receipts, cancelled checks, telephone records, utility company records, charge card receipts, cancelled mail, keys and warranties." Detective Nash and other officers served the warrant at 6:00 a.m. on August 7, 2000.

Detective Nash and the Marin County Sheriff's Office worked together with the Concord Police Department to execute the warrant. The agencies held a briefing prior to the initial entry and then, starting on August 8, held joint briefings at least twice daily. Detective Nash oversaw and coordinated crime scene processing and supervised the collection of evidence. Detective Nash testified that he made a conscientious effort to seize only items specifically listed in the search warrant or items that the officers believed they had probable cause to seize as the fruits or instrumentalities of the crime under investigation.

Upon initial entry on August 7, Detective Nash did a cursory examination of the entire premises. He saw two carpet dryers and noticed that the carpets had been recently cleaned.

Detective Nash also noticed staining on the carpet that appeared consistent with blood or another biological substance. After less than one hour, he left the house to secure a second warrant for the Saddlewood premises and the two vehicles.

Meanwhile, the remaining officers continued to search the premises under the authority of the first warrant. When officers located an item that they believed had evidentiary value, "[t]hey would stop and then . . . come take a look at it, determine if it was possibly going to be seized or not seized." If they did not believe an item was needed, then it was not seized. With seized items, the officers photographed the item, packaged it, and then placed it in a U-Haul truck. If the item contained blood or otherwise could not be left in the truck, it was immediately taken to Marin County.

Detective Nash returned with the second Marin County warrant for the premises at 1:00 p.m. that afternoon. The warrant identified 13 categories of items: (1) forensic evidence; (2) carpet from the house; (3) blood and objects with apparent blood on them; (4) any object with human tissue, bone, or hair on it; (5) a man's long-sleeve striped shirt that had been removed from a garbage can in the Saddlewood garage; (6) a pair of men's low-cut work boots with small dark stains, removed from a garbage can in the Saddlewood garage; (7) a pair of latex gloves removed from a garbage can in the Saddlewood garage; (8) access to the house and vehicles by officers and other personnel for the purpose of investigating the death and/or disappearance of Selina Bishop; (9) "[i]tems of identification which might tend to establish the identity of persons who might have been within the premises to be searched"; (10) diaries, journals, lists, photographs, audio or video recordings, and any other materials setting forth or expressing threats, anger, or

violence toward the victims; (11) all electronic storage devices capable of storing electronic data; (12) indicia of ownership of the vehicles; and (13) "[i]ndicia of occupancy or ownership; articles of personal property tending to establish the identity of persons in control of the said premises, storage areas or containers where the above items are found consisting of rent receipts, cancelled checks, telephone records, utility company records, charge card receipts, cancelled mail, keys and warranties."

Upon his return to the premises, Detective Nash held a briefing with the officers and provided them with copies of the second warrant so they could determine what fell within the scope of the warrant. A deputy district attorney arrived on the scene around the same time, along with Concord police officers, because "someone saw something related to [the] Stinemans and was aware that they were a missing couple and that's when [they] started making some links at that point."

In the late afternoon or evening of August 7, Detective Nash and his team became aware that body parts had been recovered in gym bags in the Delta. The officers believed the remains may have belonged to the Stinemans and Bishop. On the evening of August 7, Detective Nash assisted the Concord Police Department in obtaining a search warrant from the Contra Costa County Superior Court. This warrant authorized a search of the Saddlewood premises for 15 categories of items: (1) various pieces of property stolen from the Stineman residence, including financial documents, a missing answering machine tape, and Social Security cards; (2) two men's suits; (3) lime green women's clothing; (4) women's tan driving gloves; (5) a gold-colored cowboy hat, receipt for such a hat, or a photo of such a hat; (6) receipts for purchase or rental of a wheelchair;

(7) handwriting and/or handprint exemplars for defendant, Justin, and Godman; (8) documentation of names and account information of persons who had accounts with Morgan Stanley; (9) "[d]ocumentation, such as letters, notes, diaries, journals, etc., which tend to prove a connection between Selina Bishop and [defendant], and any documentation which tends to show the nature of that relationship"; (10) latex gloves; (11) hair dye; (12) forensic testing; (13) "[a]ny item which would tend to show where Mr. and Mrs. Stineman are, including any documents or items showing travel from or within the Bay Area"; (14) latent print testing; and (15) any footwear with a waffle-type pattern on the sole. The warrant was executed beginning on the morning of August 8.

On August 10 or 11, Detective Nash and the officers became aware that the cut marks in the bones suggested the use of a power reciprocating saw. More details about the condition of the bodies, and the Jet Ski rental, were discovered over the following few days. Officers were still actively searching the Saddlewood premises pursuant to the warrants at the time.

When asked about the seizure of receipts at the Saddlewood premises, Detective Nash explained that even if a receipt does not contain the name of the purchaser, officers consider that item indicia of occupancy because "we track people all the time . . . by receipts to identify who made the purchases." Pursuant to the second search warrant, officers seized a bathtub after it showed a positive reaction for the presence of blood. They seized floorboards from the house for the same reason. When defense counsel questioned why officers seized certain items — like posters of dragons — not specifically identified in that warrant, Detective Nash explained that officers seized evidence of "witchcraft and occult type activities" that were

found "in plain view" after they learned that the organs had been removed from the victims. The officers also seized a poster depicting a marijuana leaf because they believed it showed drug usage at the residence and is "kind of a gateway drug that people that use higher level of drugs will start."

Detective Steve Chiabotti of the Concord Police Department also testified at the hearing. Detective Chiabotti testified that he was the lead detective for the Concord investigation into the Stinemans' disappearance and participated in obtaining the third Saddlewood search warrant. He and his team held daily briefings with the Marin County officers to discuss developing information and share what evidence had been collected. When asked at the hearing whether he used a guideline to distinguish between items to be seized and those not to be seized, Detective Chiabotti replied that in his mind, "anything that was related to instrumentality of the crimes that [they] were investigating, evidence that would tend to show who committed the crimes, how the crimes were committed, evidence which went to state of mind rather, planning, preparation," was subject to seizure.

Marin County officers ended their search of the Saddlewood premises on August 15, eight days after serving the first search warrant. Concord officers relinquished control of the premises around August 22.

On July 25, 2003, the trial court denied the motions to suppress. The court found that the detectives were credible witnesses, and that they had a right to search the entire house and look for trace evidence, which allowed them to look "virtually in every nook and cranny" of the premises. The court found that every seized item was either within the scope of the

warrant or within plain view and incriminating in nature. The court further ruled that any item that might have been outside of the Marin County warrants would have been inevitably discovered during execution of the Contra Costa County warrant.

## C. Discussion

The Fourth Amendment to the United States Constitution protects individuals against unreasonable searches and seizures by government officials. "The warrant clause of the Fourth Amendment expressly provides that no warrant may issue except those 'particularly describing the place to be searched, and the persons or things to be seized.'" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1291 (*Bradford*).) "'General warrants,'" which involve "'"a general, exploratory rummaging in a person's belongings,"'" are prohibited by the Fourth Amendment. (*Bradford*, at p. 1291.) But "in a complex case resting upon the piecing together of 'many bits of evidence,' the warrant properly may be more generalized than would be the case in a more simplified case resting upon more direct evidence." (*Ibid.*) "Even if the warrant is legally sufficient" insofar as it is based on probable cause and describes with sufficient particularity the place to be searched or the person or things to be seized, the search may still be "unreasonable" when "it results in the seizure of property which was not specifically described in the warrant and is unrelated to probable criminal activity." (*People v. Cook* (1978) 22 Cal.3d 67, 98; see § 1538.5, subd. (a)(1)(B)(ii), (iv) [a defendant may move to suppress evidence when the search was pursuant to a warrant and, inter alia, the "evidence obtained [was] not that described in the warrant" or the method of execution of the warrant was

unlawful].)[4] At the same time, "the mere fact a large number of items were seized, many of which were not listed in the warrant, does not establish that the search was an illegal general search." (*People v. Kraft* (2000) 23 Cal.4th 978, 1043 (*Kraft*).)

"When reviewing a trial court's denial of a motion to suppress evidence obtained pursuant to a warrant, '[w]e defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment.'" (*People v. Carrington* (2009) 47 Cal.4th 145, 166 (*Carrington*).) "In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.'" (*In re Caden C.* (2021) 11 Cal.5th 614, 640.) "Accordingly, '[w]e view the evidence in a light most favorable to the order denying the motion to suppress' [citation], and '[a]ny conflicts in the evidence are resolved in favor of the superior court ruling.'" (*People v. Tully* (2012) 54 Cal.4th 952, 979; see also *People v. Johnson* (2006) 38 Cal.4th 717, 723 [deferring to trial court's finding regarding officer's purpose during search]; *People v. Woods* (1999) 21 Cal.4th 668, 673–674 [same].)

---

[4] "Pursuant to article I, section 28, of the California Constitution, a trial court may exclude evidence under Penal Code section 1538.5 only if exclusion is mandated by the federal Constitution." (*People v. Banks* (1993) 6 Cal.4th 926, 934.)

Defendant concedes the warrants here satisfied the particularity requirement and were supported by probable cause. But in making his blanket suppression challenge, he contends the officers exceeded the scope of the two Marin County warrants during their search of the Saddlewood premises.[5] He asserts that, in executing these warrants, the officers acted with flagrant disregard of the terms of the warrants and used the term "indicia" to justify seizing items they did not have probable cause to seize under the plain view doctrine. As a consequence, defendant argues, the trial court should have suppressed *all* evidence seized pursuant to these warrants, as well as evidence subsequently obtained as "fruits" of these seizures. Defendant further argues that the trial court's error in not granting the suppression motion means that defendant must be allowed to withdraw the guilty pleas that he entered after the trial court denied the motion to suppress.

In arguing that wholesale suppression is required here, defendant relies on federal precedent finding such a remedy appropriate in certain " 'extraordinary' " circumstances (*U.S. v. Foster* (10th Cir. 1996) 100 F.3d 846, 852 (*Foster*)) in which

---

[5] Defendant bears the burden of proof on this issue. (See *Theodor v. Superior Court* (1972) 8 Cal.3d 77, 101 ["In general, the burden is on the defendant to raise the issue of illegally obtained evidence"]; see also Levenson, Cal. Criminal Procedure (The Rutter Group 2021) § 6:17, p. 6–19 ["If a warrant was used, the search or seizure is presumed to be lawful, and the burden of demonstrating that it was illegally executed remains with the defendant" (fn. omitted)]; Caskey, Cal. Search & Seizure (2023) § 3:1, p. 316 ["At the hearing on the motion to suppress, who has the burden of proving the government did/did not violate the fourth amendment? The burden of proof lies with the prosecution if the search was without a search warrant; with the defense if the search was pursuant to a search warrant"].)

officers conducting a search exceeded the parameters of the authorizing search warrant to such an extent as to render the search a general one (*ibid.*; see also *U.S. v. Uzenski* (4th Cir. 2006) 434 F.3d 690, 706; *U.S. v. Liu* (2d Cir. 2000) 239 F.3d 138, 140; *U.S. v. Chen* (9th Cir. 1992) 979 F.2d 714, 716).

"Without passing upon the question ourselves, we previously have acknowledged that a majority of the federal circuits recognize the remedy of blanket suppression in a sufficiently egregious case." (*Kraft, supra,* 23 Cal.4th at p. 1044, citing *Bradford, supra,* 15 Cal.4th at pp. 1304–1307.) But as we explained, courts in these cases "rarely have actually concluded that police conduct was so extreme as to warrant total suppression. The remedy has been justified when the police exceeded the 'scope of the warrant in the places searched' [citations], the police used the warrant as a pretext to search for evidence of unrelated crimes [citation], or the police were motivated ' "by a desire to engage in indiscriminate 'fishing' " ' rather than by 'considerations of practicality' [citation]. The mere magnitude of the seizures does not establish a violation of the federal Constitution." (*Bradford*, at p. 1306, fn. omitted.)

We again assume for argument's sake that the remedy of total suppression may be appropriate in extreme circumstances of flagrant government misconduct. (*Bradford, supra,* 15 Cal.4th at p. 1306; *Kraft, supra,* 23 Cal.4th at p. 1044.) And as in *Bradford* and *Kraft*, we conclude that the facts here do not warrant this extreme remedy.

Defendant contends the officers deliberately disregarded the terms of the warrants, effectively transforming them into unconstitutional "general warrants." According to defendant, Detective Nash applied for a narrow, particularized warrant —

while withholding his true "investigative purpose" and his subjective intent to seek a broad array of documents and evidence relating to the Stinemans' murder while executing the warrants. We are not persuaded that the officers converted the search into " ' "a general, exploratory rummaging" ' " (*Bradford, supra*, 15 Cal.4th at p. 1291) in executing the two search warrants at issue here.

The search warrants were obtained in the context of a complex, rapidly evolving investigation relating to two known homicides and additional missing persons. By their plain terms, the warrants authorized particularized but broad seizures, allowing the officers to search all areas where they might find specified firearms, ammunition, keys, receipts, documents, and indicia of occupancy or ownership. (*Kraft, supra*, 23 Cal.4th at p. 1043 [finding it permissible for officers to "look[] in a spot where the specified evidence of crime plausibly could be found, even if it was not a place where [the specific items] normally are stored"]; *People v. Diaz* (1992) 3 Cal.4th 495, 563 [where search warrant authorized police officers to search for notes, memoranda, and other documents, officers properly "looked in places where they might expect to find the documents listed in the search warrant in the event defendant had attempted to hide them or throw them away; those places included trash receptacles and a bedroom closet"]; *Skelton v. Superior Court* (1969) 1 Cal.3d 144, 158 ["Since the warrant mandated a search for and seizure of several small and easily secreted items, the officers had the authority to conduct an intensive search of the entire house, looking into any places where they might reasonably expect such items to be hidden"].) Under these circumstances, the officers did not exceed the scope of the

warrant in the places searched. (*Bradford*, *supra*, 15 Cal.4th at p. 1306.)

The record also belies defendant's claim that Detective Nash, or any of the other officers, used the warrants "as a pretext to search for evidence of unrelated crimes" (*Bradford*, *supra*, 15 Cal.4th at p. 1306). On the contrary, the trial court credited Detective Nash's testimony that they made a conscientious effort to seize only those items of evidence either listed in the warrants or those they had probable cause to seize. Detective Nash carefully supervised the collection of evidence and, along with other involved agencies, held regular briefings both prior to the initial entry of the premises and at least twice daily thereafter. The detective's actions do not demonstrate an effort to engage in a pretextual search or conceal relevant information from the magistrate who issued the warrants. When additional information was obtained following the detective's initial entry, revealing a carpet stain consistent with blood and efforts to conceal this evidence, the detective left the house after less than one hour to secure a second warrant allowing for the seizure of forensic evidence. He then made copies of the second warrant for the other investigating officers performing the search. The fact that Detective Nash's affidavit in support of the second warrant does not mention the Stinemans does not support defendant's claim of pretext or flagrant disregard; it is unsurprising given the evolving investigation that was unfolding.[6]

---

[6] As noted *ante*, members of the district attorney's office and Concord police officers arrived at the Saddlewood premises after Detective Nash obtained the second search warrant. They

We also are not persuaded by defendant's efforts to show that "the police were motivated ' "by a desire to engage in indiscriminate 'fishing' " ' rather than by 'considerations of practicality' " (*Bradford*, *supra*, 15 Cal.4th at p. 1306). As in *Bradford*, the sequence of events we have already recounted here "does not demonstrate that the officers had not been briefed or prepared as to the objects of the search [citation], or that their search amounted to a 'fishing expedition.' [Citation.] Nor was the behavior of the officers so unconscionable as to amount to a due process violation." (*Id.* at pp. 1306–1307.) And defendant's reliance on the "numerosity and . . . bulk" of the items seized is unavailing. (See *Kraft*, *supra*, 23 Cal.4th at p. 1043 ["the mere fact a large number of items were seized, many of which were not listed in the warrant, does not establish that the search was an illegal general search"]; *Bradford*, at p. 1296 [rejecting the defendant's argument that "because the officers seized more items not named in the warrant than items named, this circumstance establishes the exploratory nature of the search"].)[7]

---

"started making some links at that point" but did not become aware that body parts had been recovered in gym bags in the Delta until the late afternoon or evening of August 7. Believing that the remains may have belonged to the Stinemans and Bishop, on the evening of August 7, Detective Nash assisted the Concord Police Department in obtaining a search warrant from the Contra Costa County Superior Court. This third warrant, not challenged here, specifically mentioned evidence relating to the Stinemans' murders. The warrant was executed beginning on the morning of August 8.

[7] Defendant repeatedly objects to Detective Nash's treatment of the "indicia" language in the warrants, contending

In addition to noting the substantial amount of material seized from the Saddlewood premises, defendant mentions certain items — the seizure of eyeglasses, a day planner, posters depicting a marijuana leaf and fantasy themes,[8] items perceived to be connected to witchcraft, and various receipts — as purportedly indicative of a general search. But some of these items could reasonably be regarded as falling within the warrant descriptions authorizing the seizure of indicia of occupancy or ownership, or as "[i]tems of identification which might tend to establish the identity of persons who might have been within the premises to be searched" — a broad description,

---

the detective seized whatever evidence he wanted "without regard to how that term was defined in [the] warrants." According to defendant, the "Marin detectives were not guided by their warrants description of indicia, but by their own standard operating procedures." The detectives never testified that their standard practice was to ignore the terms of the warrants. As noted, Detective Nash instead explained they endeavored to seize items within the scope of the warrants, and the trial court found the testifying detectives to be credible. Even assuming additional evidence was obtained, blanket suppression is not an appropriate remedy here. As in *Bradford*, in light of the totality of the record before us, we are not persuaded that the detectives' conduct rises to the level of flagrant disregard that might justify defendant's request to suppress all evidence seized incident to the execution of a warrant. (See *Bradford, supra,* 15 Cal.4th at p. 1306 ["The officers may have entertained the hope that evidence pertaining to unrelated crimes also would be discovered, but it is very apparent that the search was not simply a pretext for a general search for evidence of unrelated crimes"].)

[8] These posters were described by the defense in proceedings below as featuring dragons, "Valhalla warriors w[ith] axes [and] sword in fight," a "Skeleton — Grateful Dead type," and "a Wonder Woman type."

but one that officers were entitled to rely upon. (See *Messerschmidt v. Millender* (2012) 565 U.S. 535, 547–548; *People v. Balint* (2006) 138 Cal.App.4th 200, 207 ["As many courts have observed, 'officers executing a search warrant are "required to interpret it," and they are "not obliged to interpret it narrowly" ' "]; *People v. Howard* (1976) 55 Cal.App.3d 373, 376 [upholding the seizure of currency under a warrant provision describing " 'articles of personal property tending to establish the identification of person or persons having dominion or control' of the premises"].) In his testimony at the suppression hearing, for example, Detective Nash explained that officers seized the eyeglasses as indicia of who had been present in the residence. At some point in the investigation, he testified, police determined that the victims wore glasses, and they determined "it[ was] possible that [the glasses they found during the search] were the victims' glasses." Similarly, Detective Nash testified that police frequently use receipts to determine occupancy of a home, and that even when receipts do not contain the name of a purchaser, police "track people all the time by . . . receipts."[9]

---

[9] Insofar as there is any question whether certain indicia of occupancy were properly seized under the first warrant for the Saddlewood premises, given the specific phrasing of its provisions relating to indicia of occupancy or ownership of the premises, it seems clear that these items would have been inevitably seized under the terms of the second warrant concerning "[i]tems of identification which might tend to establish the identity of persons who might have been within the premises to be searched." The circumstances presented here do not reflect that either the decision to procure this warrant, or the inclusion of this language in the warrant, was tainted by any illegal conduct by law enforcement. (See *Nix v. Williams* (1984) 467 U.S. 431, 444; *People v. Carpenter* (1999) 21 Cal.4th 1016,

We also agree with the Attorney General that defendant's argument largely overlooks the significance of the plain view doctrine. "Officers executing a warrant may seize items of evidence or contraband not listed in the warrant but observed in plain view." (*Carrington*, *supra*, 47 Cal.4th at p. 166.) "The plain view doctrine does not create an independent 'exception' to the warrant clause, but simply is an extension of whatever may be the prior justification for the officers' 'access to an object.' [Citation.] The officers lawfully must be in a position from which they can view a particular area; it must be immediately apparent to them that the items they are observing may be evidence of a crime, contraband, or otherwise subject to lawful seizure, and the officers must have a lawful right of access to the object." (*Bradford*, *supra*, 15 Cal.4th at p. 1295.)

There is substantial evidence supporting the trial court's determination that seizures of items not specifically described in the warrant were nonetheless appropriate under the plain view doctrine, and did not reflect a general, indiscriminate search of the premises. Detective Nash testified that seizures were made in light of "[t]he entire picture of what [they] were getting as [they] were getting it and whether it was related to this series of murders and financial stuff." He further explained: "So we wouldn't just arbitrarily say yeah, that's related. We would actually have information at some point in there that we felt that it was related to the series of crimes." And Detective Nash responded in the affirmative when asked whether he had

1040 ["Evidence need not be suppressed if the prosecution can establish by a preponderance of the evidence that the information would inevitably have been discovered by lawful means"].)

made "every effort to try to seize only those items that were either specifically listed in the search warrant or items which [he] believed there was probable cause to believe constituted the fruits [or] instrumentality of the crime."  Similarly, Detective Chiabotti testified that the evidence that was seized at the premises "related to instrumentality of the crimes [they] were investigating, evidence that would tend to show who committed the crimes, how the crimes were committed, evidence which went to state of mind . . . , planning, preparation."

There also is ample support for the trial court's determination that the seizure of various items in plain view did not involve officers searching in places that the warrants did not allow.  (See *Kraft*, *supra*, 23 Cal.4th at p. 1043 [in properly executing a warrant, "officers merely looked in a spot where the specified evidence of crime plausibly could be found, even if it was not a place where [such items] normally are stored"]; *People v. Alcala* (1992) 4 Cal.4th 742, 799; *People v. Nicolaus* (1991) 54 Cal.3d 551, 575.)  And it would have been immediately apparent to officers conducting this search that many seized "items might have had some bearing on the current offenses" (*Bradford*, *supra*, 15 Cal.4th at p. 1306), whether as relating to motive or to other relevant circumstances of the crimes under investigation.  (See, e.g., *Warden, Maryland Penitentiary v. Hayden* (1967) 387 U.S. 294, 307 ["probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction"]; *People v. Gallegos* (2002) 96 Cal.App.4th 612, 623 ["the required 'nexus' " for application of the plain view doctrine "is that between the item discovered and a criminal activity, though not necessarily the criminal activity denominated in the warrant"]; *U.S. v. Menon* (3d Cir. 1994) 24 F.3d 550, 562 ["the immediate

apparency of criminality should be measured, at a minimum, by the collective knowledge of the officers on the scene"].)

We pause here to emphasize the limited inquiry before us. The issue before us is not whether the officers properly seized every specific item of evidence (such as the posters or evidence of witchcraft) under the two challenged warrants.[10] Rather, the question here is whether the unusual remedy of blanket suppression of all seized evidence should be applied. A review of the entire record before us and the totality of the officers' conduct does not reveal the kind of flagrant disregard of Fourth Amendment protections that might justify the extraordinary remedy of wholesale suppression of all seized evidence. Defendant's arguments resemble the claims we considered and rejected in *Kraft*, where the defendant "vaguely assert[ed], 'It is not any single item that presents the problem, but the overall array of items taken and the failure to present any substantial reason for seizing many items that highlights the overall legal problem.'" (*Kraft, supra*, 23 Cal.4th at pp. 1049–1050.) This court found that the argument was so lacking in specificity that it "virtually defies review," and that defendant's argument that the People bear the burden to justify the seizure of items in plain view is contrary to the established rule that "on appeal[,] all presumptions favor the judgment." (*Id.* at p. 1050.)

The cases defendant relies upon to support his request for wholesale suppression involved substantially more egregious

---

[10] Even if defendant had developed an argument on appeal challenging individual seizures, it is at the very least doubtful that the items mentioned in his briefing likely affected his decision to plead guilty. (Cf. *People v. Hill* (1974) 12 Cal.3d 731, 767, fn. 36 [noting the relevance and incriminating nature of the items at issue in that case].)

conduct by the executing officers. (See, e.g., *Foster*, *supra*, 100 F.3d at pp. 850–851 [complete suppression appropriate where officers executing search warrant engaged in "fishing expedition *for the discovery of incriminating evidence*," admittedly " 'took anything of [monetary] value,' " and made "no attempt . . . to substantiate a connection" between items seized and the terms of the warrant in a "deliberate and flagrant action taken in an effort to uncover evidence of additional wrongdoing"]; *U.S. v. Rettig* (9th Cir. 1978) 589 F.2d 418, 421–423 [complete suppression ordered where the warrant that the officers obtained from one magistrate "was used as an instrument for conducting the search for which permission had been denied [by a different magistrate] on the previous day" and "the agents did not confine their search in good faith to the objects of the warrant"].) Also inapt is *U.S. v. Sedaghaty* (9th Cir. 2013) 728 F.3d 885, in which officers procured a warrant authorizing the seizure of documents relating to the preparation of a tax return, but ultimately seized a large volume of documents relating to a charity formed by the defendant which the United States government suspected of funding terrorist activities. (*Id.* at pp. 891, 912.) The federal appellate court determined that these seizures could not be justified by reference to the warrant or its affidavit. (*Id.* at pp. 912–913.) This determination, which is not binding upon us, is in any event distinguishable. The warrants here were far broader than the warrants involved in *Sedaghaty*, and that court did not discuss the possible application of the plain view doctrine or the exclusionary rule to the facts before it — except to hold that complete suppression of all seized evidence was *unwarranted*. (*Id.* at p. 915.) Neither that decision, nor any other authorities

cited by defendant, provides persuasive support for his position that total suppression *is* appropriate here.[11]

In sum, we assume for argument's sake that the remedy of total suppression may be appropriate in extreme circumstances of flagrant government misconduct. Even so, we conclude defendant has not shown the drastic remedy of suppression of all evidence is warranted here. He has not demonstrated that the executing officers grossly exceeded or flagrantly disregarded the terms of the warrants at issue. Even assuming some of the items seized were not identified in the search warrants, this does not transform an otherwise valid search warrant into an unconstitutional general warrant. The behavior of the officers, the conditions under which the evidence was obtained, and the nature of the evidence seized — whether viewed individually or collectively — does not convince us that this extreme remedy is warranted.

## III. OTHER ISSUES

### A. Jury Selection

Defendant contends the trial court improperly excused a potential juror, and that it erred when it denied his request to

---

[11] Defendant also likens the situation here to the dog sniff of the exterior of a residence that the United States Supreme Court in *Florida v. Jardines* (2013) 569 U.S. 1, 11–12 found to constitute a "search" under the Fourth Amendment. He reasons that in both that case and here, law enforcement exceeded their "license" vis-à-vis the premises in question. We do not view the analysis in *Jardines*, which was concerned with the threshold Fourth Amendment question of whether a search occurred, as especially relevant to the quite different question of whether the officers here so exceeded the authorization conferred by the search warrants as to potentially call for complete suppression.

ask prospective jurors a question regarding the impact that certain evidence might have on their assessment of the appropriate sentence. We find defendant's arguments unpersuasive.

    1. *Excusal of Prospective Juror*

      a. *Factual background*

Defendant asserts the trial court's removal of prospective juror J.W. based on her views regarding the death penalty violated his federal constitutional right to due process and an impartial jury.

In her written questionnaire, when asked to describe her general feelings regarding life in prison without the possibility of parole, prospective juror J.W. wrote, "I believe it would be a terrible sentence to receive." When asked to describe her general feelings regarding the death penalty, J.W. wrote, "I'm not sure that I believe in the death penalty." She opined that the death penalty was imposed "too often." When asked if she would be willing to listen to all of the evidence and the court's instructions on the law, and give honest consideration to both life in prison without the possibility of parole and death before reaching a penalty, J.W. answered "Yes," adding, "I think?" In response to another similarly worded question, J.W. again answered "Yes" and added, "Hopefully." When asked if she had opinions that would cause her to never vote for the death penalty, regardless of the evidence presented at the penalty trial, she answered "No." J.W. indicated that she was "[m]oderately against" the death penalty, explaining: "I think I lean toward being against the death penalty. I'm just not sure what I would decide." When asked if it would be difficult for her

to apply the law if the court's instructions on the law differed from her own beliefs and opinions, J.W. checked "Yes."

During voir dire, the trial court noted J.W.'s answer that it might be difficult for her to disregard her own beliefs to follow the court's instructions and asked her how she felt about that. She replied, "Still I think it would be difficult." The court asked if she would be able to follow the law even though it would be difficult. J.W. replied that she "really believe[d] in the system that we have" and thought she could follow the law. The court noted that some time had passed since J.W. filled out her questionnaire and asked if she still believed she could consider both penalties equally. J.W. replied, "I thought about it, you know, I have to say that if I had to vote on the death penalty I would vote against it. That being said, could I just — don't know what I would do."

During the prosecutor's voir dire, he first spoke to the group of prospective jurors, noting that some people indicated they were inclined to be against the death penalty, but could still vote for it in an appropriate case. He then spoke to J.W., stating, "[Y]ou said a couple things — 'I'm not sure I believe in the death penalty.' Another point you said something like, 'I'm inclined to be against it' or something like that, that's kind of the sentiment you expressed here this afternoon. [¶] And it also sounds like you've thought about it a little bit between when you came in here three weeks ago and today; is that a fair characterization?" J.W. confirmed it was fair. The prosecution asked her if she would be able to follow the law as instructed. J.W. explained, "I'm thinking that I would like to say that I would, you know, you just don't know until the time comes, you know, what you're going to [do]." The prosecutor explained that the law never requires a juror to impose the death penalty, and that jurors are

not expected to abandon their "morality or . . . belief structure" while deliberating. He asked J.W., "If what I'm saying here is accurate, that you do bring your own sense of morality and . . . who you are as a human being to bear on this case, would you agree that it would be very difficult, if not impossible for you, given your belief structure, to ever impose the death penalty?" J.W. opined that there was a one percent chance, based on her moral beliefs, that she would be able to impose the death penalty. When the prosecution sought to clarify this answer by asking whether that meant that 99 out of 100 times J.W. would not vote for death, based on her moral or philosophical beliefs about the death penalty, J.W. responded in the affirmative.

When defense counsel began her voir dire, she told J.W. that it appeared the prospective juror had "strong reservations about the imposition of the death penalty," and J.W. agreed. When counsel asked if J.W. could see herself imposing the death penalty in an appropriate case, J.W. said, "I couldn't see myself." Counsel then asked if the prospective juror would consider death as an option during deliberations. J.W. replied, "I just don't know what I would do. [¶] . . . [¶] But I sincerely doubt that I would." Defense counsel asked J.W. if she felt like she would keep an open mind, to which J.W. answered, "I like to think I would." But when counsel again asked if J.W. could impose the death penalty in "the appropriate case," the prospective juror said, "I doubt it. [¶] . . . [¶] I just don't know."

The prosecution challenged J.W. for cause. Defense counsel submitted the issue without argument. The trial court sustained the challenge: "I do believe that [J.W.] has a bias against the death penalty such that I think she said in one percent she might have been thinking — considering it, but in

all reasonable likelihood, not very likely. I will excuse [J.W.] for cause."

b. *Discussion*

"[N]ot all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." (*Lockhart v. McCree* (1986) 476 U.S. 162, 176 (*Lockhart*); see *People v. Riccardi* (2012) 54 Cal.4th 758, 778.) To determine whether a prospective juror should be excluded for cause because of his or her views on the death penalty, we inquire "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 (*Witt*); see *Witherspoon v. Illinois* (1968) 391 U.S. 510.) A prospective juror's bias need not be proven with " 'unmistakable clarity.' " (*Witt*, at p. 424.) We recognize that many prospective jurors "simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear' . . . [and] may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings." (*Id.* at pp. 424–425.)

Recognizing that the prospective juror's demeanor is an important consideration, we accord deference to the trial court judge "who sees and hears the juror." (*Witt*, *supra*, 469 U.S. at p. 426; see *People v. Flores* (2020) 9 Cal.5th 371, 388 (*Flores*) ["The trial court was in the best position to observe [the prospective juror's] demeanor, vocal inflection, and other cues

not readily apparent on the record, and we reasonably infer that the trial court based its decision not only on what [the prospective juror] said, but also on how he said it"].) In "situations where the trial court has had an opportunity to observe the juror's demeanor, we uphold the court's decision to excuse the juror so long as it is supported by substantial evidence." (*People v. Spencer* (2018) 5 Cal.5th 642, 659.)

The trial court's excusal of J.W. for cause is supported by substantial evidence. As previously detailed, in her written questionnaire, J.W. indicated that if the court's instructions conflicted with her beliefs, she would have difficulty applying the law. Although some of J.W.'s answers also expressed a willingness to listen to all of the evidence and jury instructions and consider both penalty options, she also equivocated on this point, adding "I think?" and "Hopefully" to these expressions of intent. She also responded that she was "not sure" she believed in the death penalty and believed it was imposed "[t]oo often." Later, during voir dire, J.W. told the court that she believed she could follow the law but also advised that, after thinking about it, "I have to say that if I had to vote on the death penalty I would vote against it." She then confirmed to the prosecutor that if the court allowed jurors to use their moral compasses in making a decision, her moral compass would be inconsistent with voting for the death penalty, and she could impose it only one percent of the time. Finally, J.W. agreed with defense counsel that even in an "appropriate case," she could not see herself voting for the death penalty, and that she did not know but "sincerely doubt[ed]" that she could consider death as an option. Upon further probing by defense counsel, J.W. stated that although she liked to think she would keep an open mind, she doubted, or

just did not know, whether she could vote to impose the death penalty "in the appropriate case."

This evidence is sufficient to support the trial court's excusal of J.W. as a potential juror. "Comments that a prospective juror would have a 'hard time' or find it 'very difficult' to vote for death reflect 'a degree of equivocation' that, considered 'with the juror's . . . demeanor, can justify a trial court's conclusion . . . that the juror's views would " 'prevent or substantially impair the performance of his duties as a juror . . . .' " ' " (*People v. Duenas* (2012) 55 Cal.4th 1, 12.) The trial court, which was in a position to observe J.W. during voir dire (*Flores, supra,* 9 Cal.5th at p. 388), reasonably could have concluded that J.W.'s responses to the juror questionnaire and to questions posed by the court and counsel established such impairment. (See *People v. Poore* (2022) 13 Cal.5th 266, 297– 298 [according substantial deference to trial court's evaluation of prospective jurors' expressions of doubt demonstrating substantial impairment].)

Defendant contends the trial court erred when it excused J.W. because her estimation that she could vote for the death penalty in one percent of cases confirmed her willingness to engage in the weighing process and impose a death sentence if she thought it was appropriate. But "the mere theoretical possibility that a prospective juror might be able to reach a verdict of death in some case does not necessarily render the dismissal of the juror" erroneous. (*People v. Martinez* (2009) 47 Cal.4th 399, 432.)

Defendant also relies on *People v. Pearson* (2012) 53 Cal.4th 306 (*Pearson*) in arguing that the trial court erred, but his reliance is misplaced. In *Pearson*, prospective juror C.O.

noted in her questionnaire that she could be an impartial juror and it would not be impossible for her to vote for or against the death penalty in any one case. (*Id.* at p. 328.) During voir dire, C.O. acknowledged that she did not know if she was personally for or against the death penalty, but she could nonetheless vote to impose the death penalty in an appropriate case. (*Id.* at p. 329.) And she repeatedly confirmed that she would be able to vote for the death penalty. (*Id.* at p. 330.) We concluded the trial court erred in excusing C.O. for cause, noting that "[t]o exclude from a capital jury all those who will not promise to immovably embrace the death penalty in the case before them unconstitutionally biases the selection process," and a juror should not be disqualified for failing to "enthusiastically support capital punishment." (*Id.* at p. 332.)

*Pearson* is readily distinguishable from the present case. Although C.O. was not expressly in favor of the death penalty, she repeatedly affirmed she could be a fair and impartial juror, weigh the evidence, and vote for the death penalty in an appropriate case. (*Pearson*, *supra*, 53 Cal.4th at pp. 328–330.) Here, J.W. did not repeatedly affirm that she could be a fair and impartial juror. Rather, she repeatedly expressed doubt regarding her ability to impose the death penalty, even in an "appropriate case."[12]

---

[12] In supplemental briefing, defendant asserts that *People v. Armstrong* (2019) 6 Cal.5th 735 bolsters his claim that the trial court erred when it excused J.W. for cause. In *Armstrong*, we concluded that the trial court improperly excused at least four jurors when it "applied an erroneous standard to the question of qualification" and "relied on factual bases not supported by the record." (*Id.* at p. 751.) Neither circumstance is present here;

Therefore, we reject defendant's claim of error in connection with the trial court's excusal of prospective juror J.W.

### 2. *Denial of Voir Dire Question*

#### a. *Background*

Defendant contends the trial court abused its discretion when it denied his request to ask the prospective jurors whether evidence of dismemberment would prevent them from imposing a sentence of life imprisonment without the possibility of parole.

At a hearing to discuss voir dire, the prosecution objected to two of the defense's proposed questions. Question 133 asked, "What purpose do you think the death penalty serves?" Question 134 asked, "In what types of cases do you think the death penalty should be imposed?" The prosecution argued that the questions invited prospective jurors to prejudge the evidence, and it would be "highly inappropriate" to invite the jurors to speculate under which circumstances they think the death penalty should be imposed. Justin's counsel responded that Question 134 would "save time" because "[i]t goes right to the heart of a well-recognized challenge for cause . . . potential jurors who would automatically impose the death penalty under particular circumstances." Defendant's counsel offered to

---

as discussed, the trial court applied the correct standard of law and the record supports its excusal of J.W. Relatedly, defendant argues in his supplemental briefing that the trial court "fail[ed] to comply with the Legislature's clearly expressed limitation on death qualification of California juries." Defendant acknowledges that we rejected a similar argument in a more recent case, *People v. Suarez* (2020) 10 Cal.5th 116 (*Suarez*), and he does not present any new argument to warrant our reconsideration of the constitutionality of death qualification.

withdraw Question 133 but maintained that Question 134 was necessary.

The prosecution disagreed, arguing that "it is absolutely inappropriate for counsel . . . to inquire of the jurors whether they, if they were to assume true certain facts like, for instance, dismembering of bodies, and in those circumstances would they impose the death penalty, absolutely requires them to prejudge the evidence, that is clearly an objectionable question. [¶] What is not objectionable, what they can ask, what this questionnaire does include, is inquiries into whether or not based upon the special circumstances themselves would those alone be enough or cause them to automatically vote for the death penalty in every case, okay, we agree with that." The prosecution further argued that the question invited the jury to speculate on areas where they would or would not impose the death penalty. Justin's counsel argued that Question 134 did not contain any factual information related to the case, but rather, it asked the prospective jurors, "[W]hat is your view? Do you think the death penalty should . . . always be applied in some situations? What are they?"

After a brief recess, the court turned to Question 135, which asked: "Are there any circumstances where a person convicted of murder should automatically receive the death penalty?" The court offered an alternative phrasing: "Are there any types of factual circumstance[s] for which you feel the death penalty should always be imposed, if yes, please explain." The court concluded that it would not accept Questions 133 or 134, but would allow Question 135 in either the proposed form or its alternative suggestion.

At a hearing on March 1, 2004, defendant's counsel informed the court that the parties had agreed on a final questionnaire. A few days later, defendant changed his plea to guilty and the court granted Justin's motion to sever.

On September 17, 2004, defendant proposed a question that would ask the prospective jurors if viewing photographs or videos would "upset you or influence you so that you would be unable to remain impartial to either side in this case?" The prosecution objected and proposed to reword the question to ask the prospective jurors if they would be able to keep an open mind, rather than remain impartial. The trial court noted that in Justin's trial, the prospective jurors had been asked the following question: "As a juror, you may be required to view graphic photographs of the victims and the crime scenes. Would you be able to do this and continue to carry out your other duties in this case as a juror?" The prosecution agreed with the question, but defense counsel requested more time to come up with a compromise.

The defense subsequently proposed asking prospective jurors, "Are there any factual circumstances for which you feel the death penalty should automatically be imposed?" The prosecution objected, arguing that the question asked the jurors to prejudge the evidence. The court acknowledged that "most people" answer this question with a circumstance unrelated to defendant's case — i.e., something related to children — and that the circumstances relevant to the case were covered by other questions. The trial court rejected the defense's question.

One week later, defendant filed a motion seeking to conduct voir dire on case-specific evidence of mitigation and aggravation. At a hearing on the matter, defense counsel

expanded on her desire to question the prospective jurors regarding the photographs. "Judge, my concern is that because of the gross and gruesome and horrendous and horrific nature, and all the other words that have been in the newspaper, facts of this case and the evidence . . . that the jurors have to have some preparation for what they're going to see." The court confirmed that the prospective jurors would be told that they would see photographs depicting body parts but advised defense counsel that insofar as she sought to ask jurors if they would always impose death if the crime involved "this fact and this fact and this fact," counsel was "asking them to make a predetermination based upon certain facts that you're giving them. And that, I don't want to do."

In further argument, defense counsel stated that she wanted to ask the prospective jurors how they felt about dismemberment and whether they would "be able to sit here and say this man should live" after hearing that he "desecrated and dismembered three people's bodies." After the court said such a question would also be asking the jurors to prejudge the case, defense counsel clarified that she wanted to ask if they could put "that" aside and not prejudge the case. The prosecution replied that "[t]hey don't have to put that aside. That's a circumstance in aggravation." The prosecution suggested that counsel could ask the prospective jurors if they could keep an open mind and not make any decisions about the case until they have heard all the evidence presented. Defense counsel replied that it was important to inform the potential jurors that the pictures would be gruesome.

The court told counsel that it would not allow prospective jurors to be shown pictures and then be asked whether they could be a fair juror, but stated that it would inform potential

jurors that the case involved "gory" facts and "body parts." The court recognized that questioning on this subject involved a "gray area," but added that if counsel's questions strayed from the "issues" presented by the case and got "too far into a fact and then a juror's opinion based upon those facts," the court would sustain an objection. The court stated that the propriety of such questions during voir dire would be resolved on a "question by question" basis, adding, "But I think everyone knows how I feel on that."

The juror questionnaire that ultimately was used stated that the Stinemans were an elderly couple and that "dismembered remains of the Stinemans and Selina Bishop were found floating in gym bags along the Mokelumne River (Delta Region) in August 2000." The questionnaire also informed prospective jurors that they would be required to view photographs or videos "of the people who were killed and the scene where it occurred," and asked whether that would "influence you so that you would be unable or unwilling to consider any other evidence presented?" The questionnaire did not otherwise discuss the dismemberment of victims, or its possible effect on juror deliberations. Prospective jurors were also asked, "Would you <u>always</u> vote for the death penalty in a case involving more than one murder [or murder committed during a robbery or murder committed during a kidnapping]? In other words, would you <u>automatically</u> vote for a sentence imposing the death penalty regardless of what the evidence was during the penalty trial?"

When the penalty phase voir dire began, the trial court instructed the panel that the "proper frame of mind for a juror entering the penalty trial would be to have an open mind, a willingness to consider each of the two possible penalties in light

of all the evidence and the Court's instructions on the law.  It would be unacceptable for a juror to approach the penalty phase having ruled out one penalty or the other."

During voir dire, defense counsel advised a prospective juror that the case "involves extreme violence" and asked whether the juror could still, if appropriate, return a sentence of life without parole.  When the prosecutor objected to the question, the trial court told defense counsel, "When you say here are specific facts[] this case involves and could you vote a certain way, you are asking them to prejudge the evidence.  If you say a case that involves extreme violence, is that going to cause a problem for you? . . .  You can't ask him how specifically they're going to vote.  You can't do that, based on facts that you've given in the hypothetical."  Later in voir dire, defense counsel asked a cohort of prospective jurors, "the reality is that you're going to spend six or seven or eight weeks seeing [defendant] every day in court.  You know that he's pled guilty to five murders.  You read the paragraph about the dismembered bodies.  [¶]  The question is . . . Could you, if you thought the case was appropriate, come back with a verdict of life without the possibility of parole[?]"

One of the potential jurors who was asked this question replied, "With the little that I know about this case being multiple murders, being mutilation or dismemberment of bodies, premeditation, I would consider the life without parole, but that would be an uphill battle for me."  However, this candidate subsequently clarified that his feelings regarding such evidence would not preclude him from voting for life without parole.  And subsequently, the trial court provided the following clarification to prospective jurors:  "[A]gain, we're not going to be asking you . . . how you would vote.  We don't want

to know that because you haven't heard the evidence yet. If you have certain feelings about certain issues in this case such as multiple murder, you need to let us know about that. We're not going to get into specifics here. I won't allow that. [¶] We can ask [the prospective juror] with regard to multiple murder or something like that, what her feeling is with regard to the death penalty."

b. *Discussion*

Defendant contends the trial court improperly prevented his counsel from asking prospective jurors about the impact that evidence of corpse dismemberment and desecration would have on their deliberations, and that this alleged error violated settled law, had no legitimate purpose, was an abuse of discretion, precluded identification of jurors who would automatically impose death, and violated his federal constitutional rights. We disagree.

Defense counsel and the prosecution are permitted to ask prospective jurors questions that are specific enough to determine whether the juror harbors a bias, based on a circumstance or fact shown by the trial evidence, that would affect their ability to follow the court's instructions when weighing aggravating and mitigating evidence and determining the penalty. (*People v. Cash* (2002) 28 Cal.4th 703, 720–721.) Death qualification voir dire "must not be so abstract that it fails to identify those jurors whose death penalty views would prevent or substantially impair the performance of their duties as jurors in the case being tried. On the other hand, it must not be so specific that it requires the prospective jurors to prejudge the penalty issue based on a summary of the mitigating and aggravating evidence likely to be presented." (*Id.* at pp. 721–

722.) A trial court has considerable discretion in determining what questions are permitted. (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 758.) "Where the court exercises its discretion to exclude certain questions from the questionnaire, we will affirm unless the voir dire was so inadequate that the resulting trial was fundamentally unfair." (*People v. Leon* (2015) 61 Cal.4th 569, 586 (*Leon*).)

We have previously rejected arguments similar to those raised by defendant. In *People v. Zambrano* (2007) 41 Cal.4th 1082 (*Zambrano*), the defendant killed and dismembered the victim. (*Id.* at pp. 1096–1097.) During voir dire, defense counsel sought to ask the prospective jurors if the gruesome nature of the dismemberment might influence their views on an appropriate penalty. (*Id.* at pp. 1118–1119.) The trial court rejected the request, concluding that asking prospective jurors about how dismemberment might affect them would require them to prejudge the case. (*Id.* at p. 1119.) We affirmed the trial court's ruling, holding that it did not abuse "its broad discretion." (*Id.* at p. 1122.) We noted that the trial court permitted the defense to explore several specific circumstances of the case with the prospective jurors, including that the defendant and the victim were both members of the same city commission and the allegation that the defendant killed the victim to eliminate him as a witness in an assault case. (*Ibid.*) Several times, counsel's inquiry touched upon the dismemberment issue. (*Ibid.*)

We explained that "[i]n *Cash* — our only reversal of a death penalty judgment for failure to allow sufficient inquiry into jurors' death penalty attitudes about particular facts — we stressed that the court had refused to allow defense counsel to ask prospective jurors about 'a general fact or circumstance . . .

*that could cause some jurors invariably to vote for the death penalty, regardless of the strength of the mitigating circumstances.' "* (*Zambrano, supra,* 41 Cal.4th at p. 1121.) Unlike in *Cash,* "the condition of the adult murder victim's body when found — was not one that could cause a *reasonable* juror — i.e., one whose death penalty attitudes *otherwise* qualified him or her to sit on a capital jury — *invariably* to vote for death, regardless of the strength of the mitigating evidence. No child victim, prior murder, or sexual implications were involved. Nor, to the extent juror emotions might thereby be aroused, would there be evidence that [the victim] was dismembered while alive." (*Id.* at p. 1122.) We acknowledged that the average juror would certainly be affected by a condition like dismemberment, similar to any brutal circumstance of a homicide. "But the fact of dismemberment, in and of itself, does not appear so potentially inflammatory as to transform an otherwise death-qualified juror into one who *could not* deliberate fairly on the issue of penalty." (*Id.* at p. 1123.)

Likewise, in *People v. Rogers* (2009) 46 Cal.4th 1136, the defendant argued on appeal that the trial court should have inquired whether prospective jurors' penalty phase decisionmaking would be affected by the facts "that defendant was close to his three alleged murder victims, that one of the victims was pregnant, that another was the mother of his child, and that two were dismembered." (*Id.* at p. 1152.) We rejected the defendant's assertion, explaining that "it was more than sufficient that the prospective jurors — having been informed that defendant allegedly murdered a male friend and two former girlfriends — were asked, in various ways, whether there were circumstances under which they would impose the death penalty automatically regardless of other legally relevant

factors." (*Ibid.*) We specifically addressed, and once again rejected, the position that prospective jurors must be informed that the charged homicide involves dismemberment, especially absent evidence that dismemberment occurred while the victim was alive. (*Ibid.*) In so holding, we explained that in such situations, "it is 'not error to refuse to permit counsel to ask questions based upon an account of the facts of [the] case, or to ask a juror to consider particular facts that would cause him or her to impose the death penalty.' " (*Ibid.*)

Defendant acknowledges the holdings in *Zambrano* and *Rogers*, but asserts his case is different because it involved only a penalty phase trial and particularly gruesome facts and desecration beyond dismemberment of the corpse, notably the feeding of human flesh to animals. We are not persuaded that these differences require a different outcome than in *Zambrano* and *Rogers*. The trial court here provided for an adequate canvas of would-be jurors. Prior to answering any questions regarding their opinion on the death penalty, prospective jurors were informed in the juror questionnaire that the case involved dismemberment and that remains were found floating in duffel bags in the Delta. It is therefore reasonable to infer that the prospective jurors considered these facts when filling out the questionnaire, including its question regarding whether viewing photographs or videos of the victims and the crime scene would render them unable or unwilling to consider other evidence. (See *Leon, supra,* 61 Cal.4th at p. 587 [although the trial court excluded questions about multiple murder, the jurors were informed of that circumstance in the questionnaire and "it is reasonable to believe the jurors had these charges and special circumstances in mind when they completed the questionnaire"].) Jurors were asked in the questionnaire

whether they would automatically vote for death in a case involving more than one murder, or a murder committed during a robbery or a kidnapping. The court and the parties also repeatedly asked prospective jurors if they could keep an open mind and consider all evidence presented before selecting an appropriate penalty. These inquiries, along with the other advisements given and questions posed to prospective jurors, were sufficient under the circumstances presented and did not render the voir dire "so inadequate that the resulting trial was fundamentally unfair." (*Leon*, at p. 586.) We therefore find no abuse of discretion notwithstanding the fact that this case involved only a penalty phrase trial and conduct by defendant going beyond dismemberment.

### 3. *Constitutionality of Death Qualification*

Defendant contends the exclusion of prospective jurors because of an unwillingness or impaired ability to impose death violated his right to a representative jury. Both the United States Supreme Court and this court have held that death qualification does not unconstitutionally alter the makeup of a defendant's jury. (*See Lockhart*, *supra*, 476 U.S. at pp. 175–176 [" 'Death qualification' . . . is carefully designed to serve the State's concededly legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial"]; *Suarez*, *supra*, 10 Cal.5th at p. 138 ["we have considered and rejected claims that the death qualification process is unconstitutional"].) Death qualification did not violate defendant's right to a jury selected from a cross-section of the community.

## B. Admission of Evidence

Defendant contends the trial court abused its discretion when it admitted evidence of corpse dismemberment. He specifically challenges the introduction of two pieces of evidence: (1) photographs depicting the Stinemans' and Bishop's dismemberment; and (2) the sound of a reciprocating saw which played during the prosecution's closing argument.

### 1. *Factual Background*

After defendant pleaded guilty, he filed a motion to limit the photographic evidence that would be admitted at the penalty phase. He argued that photographs depicting dismemberment should be excluded under Evidence Code section 352 because they were unduly prejudicial, irrelevant as an undisputed issue, cumulative, and offensive to the victims' families. Defendant argued in the alternative that if the photographs were admitted, they should not remain in the jury's view "beyond its relevant use." The prosecution argued in response that the photographs were "the best evidence of the methodical and cold-blooded manner in which this defendant killed five people." The prosecution also argued that "the desecration of the bodies . . . [is] directly related to the enormity of the crimes committed."

At the hearing on the motion, defendant argued that because he had pleaded guilty, "there [was] no issue as to how the deaths occurred, the manner in which they occurred." He further argued that the photographs of dismemberment were inflammatory and lacked probative value for a penalty phase trial. In response, the prosecutor argued that although defendant had pleaded guilty, the prosecution was entitled to present evidence regarding the manner in which the crimes

were committed. Additionally, he argued the photographs were "circumstantial evidence of what is inside [defendant's mind]. And therefore, they are very probative of the enormity of the crime, which directly relates to the question of whether or not the evidence in aggravation is so substantial that it warrants imposition of the death penalty."

The trial court noted that the prosecution had offered a limited number of photographs in comparison to the "enormity of the amount" of photographs taken, and that several photographs had been used in Justin's trial. The court opined that the pictures of faces were "the hardest photos to look at" but the fact that the jaws and teeth of the victims had been hammered out was relevant for the jury in deciding which penalty to impose. The court found that the photos were relevant to the circumstances of the crime and that their probative value far outweighed any prejudicial effect, and agreed with defendant that the images should not remain in the jury's view indefinitely. During the trial, the photographs were displayed only during the testimony of the coroner, Dr. Gregory Reiber.

Prior to Dr. Reiber's testimony, defendant moved to exclude the operation and sound of the reciprocating saw, which was to occur during the doctor's testimony.[13] The trial court granted the motion to preclude activation of the saw, concluding "it seems to me that seeing the body in pieces tells [the] story. The doctor can talk about striations and we don't need to turn it on to show that."

_____

[13] The physical saw itself had already been admitted into evidence without objection from defendant.

Prior to closing arguments, defendant again moved to preclude activation of the saw on relevance grounds. The prosecutor argued that "turning on the saw gets the jury closer to the reality of what happened in that bathroom." The prosecutor emphasized that the saw was already in evidence and turning it on would demonstrate how it operated, which was relevant to the degree of the harm and to showing the jury the care and deliberation required to manipulate the saw.

The trial court acknowledged that during Dr. Reiber's testimony, activating the saw was not relevant to explain how the cuts were made. The court ruled, however, that activating the saw during closing argument was "relevant to show and demonstrate to the jury the gravity of the crime" and was "not overly prejudicial." The prosecutor activated the reciprocating saw during his closing argument to the jury.

### 2. *Discussion*

Only relevant evidence is admissible. (Evid. Code, § 350.) Evidence is relevant if it has a "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.*, § 210.) "The trial court has broad discretion to determine the relevance of evidence [citation], and we will not disturb the court's exercise of that discretion unless it acted in an arbitrary, capricious or patently absurd manner." (*People v. Jones* (2013) 57 Cal.4th 899, 947.) Evidence Code section 352 provides for the exclusion of evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." We review a trial court's admission of evidence under the abuse of

discretion standard. (*People v. Navarro* (2021) 12 Cal.5th 285, 339.) The "undue prejudice" contemplated by Evidence Code section 352 " 'is that which " ' "uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." ' " ' " (*People v. Chhoun* (2021) 11 Cal.5th 1, 29, italics omitted.) "As to victim photographs, the court's discretion under Evidence Code section 352 to exclude evidence showing circumstances of the crime 'is much narrower at the penalty phase than at the guilt phase. This is so because the prosecution has the right to establish the circumstances of the crime, including its gruesome consequences ([Pen. Code,] § 190.3, factor (a)), and because the risk of an improper guilt finding based on visceral reactions is no longer present.' " (*People v. Bell* (2019) 7 Cal.5th 70, 105–106.)

Defendant first contends the photographs depicting dismemberment displayed during Dr. Reiber's testimony were irrelevant because they did not address a disputed fact. He argues that because he had already pleaded guilty, there was no need for the prosecutor to present evidence of the manner of death. Defendant further argues that although dismemberment was evidence of defendant's disposal of the bodies, the trial court incorrectly classified the photographs as evidence of the *manner* of death. Defendant also contends that the activation of the reciprocating saw during closing argument was similarly irrelevant. Finally, defendant contends that both the photographs and the sound of the saw violated his constitutional rights to an impartial jury and rendered his trial fundamentally unfair. We conclude the trial court did not err in admitting the photographs, and even assuming that the prosecution should

not have been allowed to activate the reciprocating saw during closing, any assumed error was harmless.

The photographs were relevant to the circumstances of the crimes of conviction. "Under section 190.3, factor (a), the trier of fact may consider, in aggravation, evidence relevant to 'the circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true.' The 'circumstances of the crime' as used in section 190.3, factor (a), 'does not mean merely the immediate temporal and spatial circumstances of the crime. Rather it extends to "[t]hat which surrounds materially, morally, or logically" the crime.' " (*People v. Blair* (2005) 36 Cal.4th 686, 748–749.)

Here, the disputed photographs shed light on the circumstances of the crimes because, as the trial court reasoned, they were strong evidence of defendant's consciousness of guilt, the seriousness of his crimes, and the manner of death and subsequent disposal of the victims' bodies. The images depicted the removal of victims' teeth and identifiable tattoos, which demonstrated defendant's intent to conceal the identities of his victims. The photographs also assisted the jury in understanding Dr. Reiber's testimony concerning how the dismembering cuts and organ removal were executed, and the high degree of skill required to do so. Although these photographs were disturbing, we cannot say that their relevance was substantially outweighed by a countervailing consideration, and thus find no error in their admission.

This conclusion finds support from our analysis in *People v. Solomon* (2010) 49 Cal.4th 792 (*Solomon*). There, we held that photographs depicting murder victims at various stages of

decomposition were admissible at the penalty phase of a capital trial as evidence of the defendant's intent and the manner of death. (*Id.* at pp. 841–842.) We observed that the photographs "were highly relevant to the circumstances of the crimes. [Citation.] They disclosed the manner in which the victims died and substantiated that defendant intended and deliberated the murders. [Citations.] They demonstrated the callousness and cruelty of defendant's acts. [Citation.] And they corroborated the pathologists' testimony and assisted the jury's understanding of it." (*Id.* at p. 842.) The photographs introduced here were similarly relevant.

Defendant argues his case is different from *Solomon* because the photographs in that case showed decomposition *pre*mortem and *peri*mortem as it pertained to the manner of death. In his case, he argues, the photographs concerned *post*mortem violence. This purported distinction carries little weight. We recognized in *Solomon* that "[t]he 'circumstances of the crime' include what happened to the victims' bodies as a result of defendant's actions. [Citation.] The consequences of criminal conduct often extend beyond the immediate result of an isolated act." (*Solomon, supra,* 49 Cal.4th at p. 842.) Further, we have regularly upheld the admission of graphic postmortem photographs of victims during the penalty phase of a capital trial. (See *People v. Salcido* (2008) 44 Cal.4th 93, 158 [upholding admission of postmortem photograph of murder victim that also suggested molestation]; *Zambrano, supra,* 41 Cal.4th at pp. 1149–1152 [trial court did not abuse its discretion by admitting graphic dismemberment photographs]; *People v. Moon* (2005) 37 Cal.4th 1, 34–35 [graphic photos excluded during guilt phase were later admitted as penalty phase evidence]; *People v. Box* (2000) 23 Cal.4th 1153, 1201 [upholding

admission of photographs that were bloody and graphic].) Therefore, contrary to defendant's assertion, we have found photographs of both premortem *and* postmortem violence to be relevant under similar circumstances.

While the jury must be shielded from " 'depictions that sensationalize' " the alleged crimes, " 'the jury cannot be shielded from an accurate depiction of the charged crimes that does not unnecessarily play upon the emotions of the jurors.' " (*People v. Streeter* (2012) 54 Cal.4th 205, 238.) In *Streeter*, the defendant poured gasoline on his son's mother and lit her on fire; she suffered extensive burns on nearly 60 percent of her body and died 10 days later. (*Id.* at pp. 212–214.) On appeal, the defendant challenged the admission of three photographs showing the victim's burn injuries, expert testimony concerning the nature and degree of the victim's burns, and a tape recording of the victim screaming in the ambulance. (*Id.* at pp. 234–236.) We held that the trial court did not abuse its broad discretion, noting that "the evidence 'did no more than accurately portray the shocking nature of the crimes.' " (*Id.* at p. 238.) Here, defendant cannot establish that the admitted photographs were inaccurate depictions of the charged crimes, or that they unnecessarily played upon the emotions of the jurors. Again, the trial court did not abuse its discretion when it admitted the photographs.

Defendant challenges the activation of the reciprocating saw during closing argument on nearly identical relevance grounds. Ruling on objections of this nature lies within the court's broad discretion. (*People v. Simon* (2016) 1 Cal.5th 98, 147 (*Simon*) ["Trial courts have broad discretion to control the duration and scope of closing arguments"].) We acknowledge the inflammatory nature of how this evidence was used during

closing argument. However, the saw itself had already been admitted into evidence, with witnesses describing how it had been used to dismember multiple victims. And the jury heard a significant amount of testimony regarding defendant's scheme to murder the Stinemans and Bishop for money, and the manner in which he kidnapped, murdered, and disposed of the victims. Given this detailed account of the crimes, and the record as a whole, there is no reasonable possibility that defendant would have received a different outcome but for the activation of the saw during closing argument. Thus, even if we were to assume it was error to allow the prosecutor to activate the saw during closing argument, defendant has failed to establish a reasonable possibility the penalty verdict would have been different absent the use of this evidence. (See *People v. Silveria and Travis* (2020) 10 Cal.5th 195, 266, citing *People v. Lancaster* (2007) 41 Cal.4th 50, 94 [the standard that an "error is reversible if there is a reasonable possibility it affected the verdict . . . is essentially the same as the harmless beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24"]; see *People v. Brown* (1988) 46 Cal.3d 432, 448 [the reasonable possibility standard applies "when assessing the effect of state-law error at the penalty phase of a capital trial"].)

### C. Asserted Instructional Error

#### 1. *Proposed Instructions and Closing Argument*

Defendant contends the trial court's refusal to instruct the jury with certain instructions proposed by the defense, coupled with the prosecutor's asserted misstatement of the law during closing argument, precluded the jury from considering applicable mitigating circumstances. We find the prosecutor misstated the law when arguing the applicability of section

190.3, factors (d) and (h) to the jury, but the prosecutor's misstatements do not warrant reversal.

a. *Background*

After the prosecution presented its case-in-chief and rested, the parties discussed jury instructions. The defense requested 38 instructions, many of which were proposed to modify CALJIC No. 8.85.

Defendant's proposed jury instruction No. 8 informed the jurors that they could only consider section 190.3, factors (a) through (c) as aggravating factors, and the remaining factors could only be considered as mitigating factors. The trial court rejected the proposed instruction, noting that it was not required to differentiate which factors are mitigating and which are aggravating.

Defendant's proposed jury instruction No. 15 informed jurors that they were not limited to the statutory mitigating factors and may consider any circumstance in defendant's background, history, or character. The court rejected the proposed instruction, finding it duplicative of section 190.3, factor (k) in the standard instruction.

Defendant's proposed jury instruction No. 16 expanded on section 190.3, factor (d), the factor that directs the trier of fact's attention to whether the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance, by informing jurors that: (1) they could consider evidence of mental or emotional disturbance regardless of whether there was an excuse or explanation for it; (2) such disturbance is akin to heat of passion upon adequate provocation, but it need not rise to the same level to be considered mitigating; (3) such disturbance could be caused by

anything, including consumption of drugs and alcohol or mental illness; and (4) if they found that defendant suffered from such disturbance at the time of the crimes, then they must consider it as a mitigating circumstance. The court rejected the instruction, finding it argumentative.

Defendant's proposed jury instruction No. 20 modified section 190.3, factor (h) by informing jurors that the mental impairment referred to in the standard instruction included "any degree of mental defect, disease, impairment, or intoxication" that jurors believed mitigated against death. The court decided not to modify CALJIC No. 8.85 as requested and instead gave the proposed instruction as its own instruction immediately following CALJIC No. 8.85.

Defendant's proposed jury instruction No. 21, to be read following section 190.3, factor (h), informed jurors: (1) "mental disease or defect," as used in that factor, did not mean legal insanity; (2) jurors could consider whether defendant was unable to fully comprehend the wrongfulness of his conduct, or whether, knowing his conduct was wrong, he was nonetheless unable to fully conform his conduct to the law; and (3) the cause of such disease or defect could be the consumption of drugs or alcohol or any other reason. The court found the proposed instruction to be argumentative and declined to give it.

Defendant's proposed jury instructions Nos. 22 and 23 sought to categorize specific factors, or the absence of a factor, as aggravating or mitigating circumstances. The court declined to give the instructions, reminding the defense that it "has already determined that it doesn't want to designate which [factor] is mitigating and which is aggravating."

Defendant's proposed jury instruction No. 24A would have informed the jurors that the mitigating factors enumerated by the court were merely examples of some of the bases on which jurors can decide to impose a sentence of life imprisonment, and that mitigating factors need not be proven beyond a reasonable doubt. The court rejected the instruction, finding it duplicative of section 190.3, factor (k).

During closing argument, the prosecutor explained section 190.3, factors (a) through (k) to the jury. He explained that factor (b) involved prior criminal history, a circumstance in aggravation "if it applied, but we don't have it. Factor [(b)] doesn't apply." He continued, "Factor [(c)], similar, prior felony circumstances. We don't have any of that in this case. So factor [(c)] does not apply." The prosecutor moved on to factor (d), explaining that it concerned whether defendant was under the influence of a mental or emotional disturbance. He acknowledged the defense's argument that methamphetamine use caused defendant to act impulsively, and argued, "You know what folks? That doesn't apply in this case. Yes, the defendant was using methamphetamine. . . . Not only do you not have [evidence of a methamphetamine crash], this crime in this case is as far removed from impulsivity and anger as it could be. This is as cold-blooded and premeditated as it could possibly be. This case is not the product of extreme mental or emotional disturbance. Factor [(d)] does not apply here."

When discussing section 190.3, factor (h), concerning impairment due to intoxication, the prosecutor argued that this factor also did not apply. He told the jury that defendant had the capacity to appreciate the criminality of his conduct, as evidenced by defendant trying to hide the bodies and kill witnesses who could identify him. He argued to the jury that if

defendant was mentally ill and that illness prevented him from appreciating the criminality of his conduct, "you should see all kinds of criminality going on between 1990 [the time of his alleged diagnosis] and 1998.  And you don't.  Why?  No matter what you say, in the final analysis, whether or not you accept the premise of mental illness, the fact of the matter is it does not prevent the defendant the capacity to conform to the requirements of [the] law.  This factor does not apply."

When discussing section 190.3, factor (k), the prosecutor noted that "it's the kitchen sink" and any extenuating circumstance presented by the defense could be considered mitigating under factor (k).  The prosecutor reminded the jury, however, of one limitation on mitigating evidence; jurors could not consider sympathy for the defendant's family as a factor in mitigation.

Defense counsel did not object at any time during the prosecutor's closing argument.  During defense counsel's closing argument, she reminded the jurors of their obligation to weigh and consider all the evidence presented.  She explained that each juror had the right to give whatever weight that juror wanted to each mitigating factor, to decide whether any mitigating factor is significant enough to overcome the evidence in aggravation, and the right to "find your own mitigating factor."  She repeatedly reminded the jury that the law does not require a death verdict and each juror had the right to form an independent opinion, regardless of what fellow jurors believed.  She discussed defendant's history of mental illness and drug use and argued that defendant committed the crimes while under the influence of extreme mental or emotional disturbance.  Counsel argued that defendant was "generous, kind, thoughtful and caring to everyone he came into contact with" and that his

life was worth saving. She concluded by reminding the jury that defendant took legal and personal responsibility for his actions, and asserted that he did not deserve to die.

After closing arguments, the trial court read the instructions to the jury. As relevant here, the court instructed the jury with a slightly modified version of CALJIC No. 8.85 and six additional instructions immediately following CALJIC No. 8.85. The additional instructions informed the jurors that: (1) not every factor listed in CALJIC No. 8.85 would be relevant, a factor not relevant to the evidence presented should be discarded, and the absence of a mitigating factor does not constitute an aggravating factor; (2) circumstances of the crime can be considered mitigating or aggravating; (3) victim impact evidence is not a separate aggravating circumstance but may be considered as a circumstance of the crime; (4) mental impairment is not limited to evidence which excuses or reduces a defendant's legal culpability, but includes any degree of mental defect, disease, impairment, or intoxication; (5) jurors are not allowed to consider aggravating circumstances beyond the enumerated factors; and (6) jurors may consider whatever sympathy or compassion arises from the evidence presented as a reason to reject the death penalty. The trial court also instructed the jury that it must accept and follow the law as provided by the court, and if "anything said by the attorneys in their argument or any other time during the trial conflicts with [the court's] instructions on the law, [the jury] must follow [the court's] instructions."

b. *Discussion*

Defendant acknowledges that the trial court instructed the jury to consider, take into account, and be guided by the

mitigating factors provided in CALJIC No. 8.85 as applicable to defendant's case. He is not arguing the trial court erred when it refused his proposed instructions, nor is he arguing that the prosecutor committed misconduct during closing argument. He is arguing, however, that the prosecutor misstated the law regarding aggravating and mitigating factors and that the trial court's rejection of his proposed instructions, and failure to provide curative instructions, compounded the prosecutor's error. We agree the prosecutor misstated the law regarding section 190.3, factors (d) and (h), but we conclude the error was harmless.

Defendant asserts that when the prosecutor argued there was no prior criminal history or prior felony convictions, he effectively told the jury that the lack of a criminal history did not apply as a mitigating factor. A complete reading of the prosecutor's argument, however, does not support defendant's argument. When discussing the jury's responsibility in weighing the evidence presented, the prosecutor started by explaining that it was up to the jurors to decide what evidence was aggravating, what evidence was mitigating, and how much weight to give each piece of evidence. When discussing circumstances in aggravation, the prosecutor noted that prior criminal history "could be a circumstance in aggravation, if it applied, but we don't have it." He similarly said that because there were no prior felony circumstances, section 190.3, factor (c) likewise did not apply. The prosecutor then shifted gears, saying, "Now, let me talk about those other factors." The prosecutor did not argue that the absence of section 190.3, factors (b) and (c) evidence was not mitigating.

Defendant also argues that the prosecutor erroneously argued that section 190.3, factor (d) did not apply. We agree.

The prosecutor suggested that factor (d) applies only to acts committed as a result of "impulsivity," "extreme anger," and "heat of passion." He further asserted that the factor "does not apply" in this case because defendant's crime was "as far removed from impulsivity and anger as it could be" and was "as cold-blooded and premeditated as it could possibly be." The factor, by its terms, is not so limited; it applies if "the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance." (§ 190.3, factor (d); see *People v. Yeoman* (2003) 31 Cal.4th 93, 145–146 [prosecutor's statement that factor (d) " 'exists for people who are psychotic' . . . was incorrect" but prosecutor "corrected" the misstatement "by characterizing factor (d) more expansively as describing 'people who are so badly disturbed that . . . you as a human being and the law and your morality says maybe we ought to consider how screwed up they were and give them a break' "]; but see *People v. Wright* (1990) 52 Cal.3d 367, 444 [prosecution's statement, "[w]hen discussing the applicability of factor (d)," that "there was no evidence defendant was 'psychotic, delusional, paranoid, schizophrenic, or that he hallucinated' . . . was proper argument since factor (d) concerns *extreme* emotional problems"].)

We likewise agree that the prosecutor misstated the law regarding the applicability of section 190.3, factor (h). As defendant notes, the prosecutor's argument indicates that factor (h) requires that defendant lack the capacity to appreciate the criminality of his conduct or conform to the requirements of the law. However, factor (h) simply calls for consideration of any *impairment* of the relevant capacities by mental disease, defect, or intoxication. Thus, the prosecutor's argument incorrectly suggests that factor (h) does not apply because it requires

defendant to lack the capacity to conform his conduct to the law, rather than that those capacities merely be "impaired."

However, the prosecutor's comments regarding section 190.3, factors (d) and (h) do not warrant reversal. Defense counsel reminded the jury that defendant "was and is mentally disturbed," and devoted almost her entire closing argument to the proposition that the murders "were an aberration, a culmination of mental illness and drug abuse that resulted in a bizarre and completely unrealistic scheme to save the world." She told jurors that their "rights" included "[t]he right to give whatever weight [you] want[] to each mitigating fact or factors," "[t]he right to decide for yourself whether any mitigating factor is significant enough to overcome all the aggravation," and "[t]he right to find your own mitigating factor and assign to it whatever weight you think is sufficient for a vote for life."

Furthermore, following closing argument, the trial court instructed jurors that "[t]he mental impairment referred to in this instruction is not limited to evidence which excuses the crime or reduces the defendant's legal culpability, but includes any degree of mental defect, disease, impairment or intoxication which the jury determines is of a nature that death should not be imposed." The court also instructed on section 190.3, factor (k), telling jurors that they must take into account "[a]ny other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." And the prosecution reminded the jury in his argument that "[a]ny other circumstance which extenuates" could be considered under factor (k). We have consistently held

that this instruction allows jurors to consider mental conditions that do not qualify as mitigating factors under factors (d) and (h). (E.g., *People v. Welch* (1999) 20 Cal.4th 701, 768–769.)

Finally, we note that the trial court instructed the jurors that they should follow the law provided in the instructions and if counsel said anything conflicting, the jurors must follow the court's instructions. Nothing in the record before us suggests the jurors did not follow this instruction.

In light of defense counsel's argument and the trial court's instruction, "there is not a reasonable likelihood that the [jurors] would have inferred that they could not consider" evidence of defendant's mental state "in mitigation of penalty." (*People v. Mickey* (1991) 54 Cal.3d 612, 694.) On the contrary, they "undoubtedly considered defendant's mental state in determining the appropriate sentence" and, under our precedents, "whether [they] did so under" section 190.3, factor (k) "instead of" under section 190.3, factors (d) or (h) "is irrelevant." (*People v. Rich* (1988) 45 Cal.3d 1036, 1120.)

### 2. *Impact of Execution*

Defendant contends that the trial court erroneously instructed the jury regarding the emotional impact of his execution on his family as mitigating evidence during penalty deliberations. The court instructed the jury using CALJIC No. 8.85, subdivision (k), which states: "Sympathy for the family of the defendant is not a matter that you can consider in mitigation. Evidence, if any, of the impact of an execution on family members should be disregarded unless it illuminates some positive quality of the defendant's background or character." Defendant acknowledges that this court has repeatedly rejected this claim. (See *People v. Battle* (2021)

11 Cal.5th 749; *People v. Williams* (2013) 56 Cal.4th 165 (*Williams*); *People v. Ochoa* (1998) 19 Cal.4th 353.) He does not provide a persuasive reason to revisit this precedent.

### 3. *Proposed Instruction on Death Sentence*

Defendant contends that the trial court erroneously rejected two proposed instructions informing the jury that it could impose life imprisonment without the possibility of parole, instead of the death penalty, for any reason.

Defendant's proposed jury instruction No. 13 provided in relevant part: "The normative function of deciding which penalty should actually be imposed is entirely in your hands." Defendant's proposed jury instruction No. 28 provided in relevant part: "You may impose a life sentence without finding the existence of any statutory mitigating circumstance. Even if you should find beyond a reasonable doubt the existence of a statutory aggravating circumstance and find no mitigating circumstance, you may still decide that a sentence of life imprisonment without possibility of parole is the appropriate punishment in this case. In other words, you may, in your good judgment, impose a life sentence for any reason at all that you see fit to consider. [¶] It is not essential to a decision to impose a sentence of life imprisonment without possibility of parole that you find mitigating circumstances. You may spare the life of [defendant] for any reason you deem appropriate and satisfactory." The trial judge ultimately rejected the proposed language of both instructions as argumentative.

We have consistently held that CALJIC Nos. 8.85 and 8.88 " 'adequately and properly instruct on the jury's determination of sentence.' " (*People v. Anderson* (2018) 5 Cal.5th 372, 424.) Furthermore, to the extent that the proposed instructions

sought to advise the jurors that they could return a verdict of life imprisonment without the possibility of parole even if the aggravating circumstances outweighed mitigating circumstances, or in the complete absence of mitigating circumstances, we have repeatedly held a trial court is not required to give such instructions. (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 457 [the trial court is not required to instruct that the jury "could return a life verdict even if no mitigating factors had been established"].)

To the extent the proposed instructions sought to advise the jurors that they could consider mercy or sympathy in weighing the circumstances presented, they were duplicative of CALJIC No. 8.85. (See *People v. Scully* (2021) 11 Cal.5th 542, 610.) Furthermore, as requested by defendant, the trial court instructed the jury with CALJIC No. 8.85.6, explaining that it could reject the death penalty solely on the basis that mitigating evidence, such as testimony from defendant's friends and family, gave rise to compassion or sympathy.

## D. Challenges to the Death Penalty Law

Defendant raises several challenges to California's death penalty statute. He acknowledges that we have previously rejected similar challenges to the death penalty statute and provides no persuasive reason to revisit these previous holdings.

Death row delays "do not constitute cruel and unusual punishment because they resulted from the 'desire of our courts, state and federal, to get it right, to explore . . . any argument that might save someone's life.' " (*People v. McDowell* (2012) 54 Cal.4th 395, 412.) Further, "The slow pace of executions in California, . . . does not render our system unconstitutionally arbitrary." (*People v. Lee* (2011) 51 Cal.4th 620, 654.)

Defendant's argument requesting consideration of the impact of a death sentence on the families of both the victims and the condemned inmate does not alter our conclusion.

Defendant contends the Legislature has effectively suspended his rights to counsel, confrontation, and other elements of due process by failing to provide him with habeas corpus counsel in a timely manner. We have previously rejected these claims as "entirely speculative" and do so again here. (*Williams*, *supra*, 56 Cal.4th at p. 202.)

"California's death penalty law 'adequately narrows the class of murderers subject to the death penalty' and does not violate the Eighth Amendment. [Citation.] Section 190.2, which sets forth the circumstances in which the penalty of death may be imposed, is not impermissibly broad in violation of the Eighth Amendment." (*People v. Williams* (2013) 58 Cal.4th 197, 294.)

"Allowing the jury to consider the circumstances of the crime (§ 190.3, factor (a)) does not lead to the imposition of the death penalty in an arbitrary or capricious manner." (*People v. Kennedy* (2005) 36 Cal.4th 595, 641.)

The death penalty statute "is not invalid for failing to require (1) written findings or unanimity as to aggravating factors, (2) proof of all aggravating factors beyond a reasonable doubt, (3) findings that aggravation outweighs mitigation beyond a reasonable doubt, or (4) findings that death is the appropriate penalty beyond a reasonable doubt." (*People v. Snow* (2003) 30 Cal.4th 43, 126.) These conclusions are not altered by the United States Supreme Court's decisions in *Hurst v. Florida* (2016) 577 U.S. 92, *Ring v. Arizona* (2002) 536 U.S. 584, and *Apprendi v. New Jersey* (2000) 530 U.S. 466. (*People v.*

*Becerrada* (2017) 2 Cal.5th 1009, 1038; *Simon*, *supra*, 1 Cal.5th at p. 149; *People v. Rangel* (2016) 62 Cal.4th 1192, 1235, fn. 16.)

"The adjectives 'extreme' and 'substantial' in statutory mitigating factors (d) and (g) of section 190.3 do not prevent the jury from considering mitigating evidence." (*People v. Leonard* (2007) 40 Cal.4th 1370, 1429 (*Leonard*).)

"The trial court is not required to instruct the jury that statutory factors (d), (e), (f), (g), (h), and (j) in section 190.3 are relevant only as mitigating factors, not as aggravating factors." (*Leonard*, *supra*, 40 Cal.4th at p. 1430.)

Finally, California's death penalty does not violate international law or international norms of decency. (*People v. Thomas* (2012) 53 Cal.4th 771, 837.)

### E. Asserted Cumulative Error

Defendant contends reversal is warranted because of the cumulative prejudice from the errors he identifies. Even assuming the court erred in allowing the prosecutor to activate the reciprocating saw during closing argument, we have concluded it was harmless. And although the prosecutor misstated the law regarding the applicability of section 190.3, factors (d) and (h), defendant suffered no prejudice. Even considered together, these errors are harmless and there is no cumulative prejudice that warrants reversal.

## IV.  CONCLUSION

We affirm the judgment.


                                                **GUERRERO, C. J.**


**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Helzer

---

**<u>Procedural Posture</u>** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S132256
**Date Filed:** January 22, 2024

---

**Court:**  Superior
**County:**  Contra Costa
**Judge:**  Mary Ann O'Malley

---

**Counsel:**

Jeanne Keevan-Lynch, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Rob Bonta, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Ronald S. Matthias, Assistant Attorney General, Glenn R. Pruden and Sarah J. Farhat, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jeanne Keevan-Lynch
Attorney at Law
P.O. Box 2433
Mendocino, CA 95460
(707) 895-2090

Sarah J. Farhat
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3792